No. 99-342

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 13

MONTANAS FOR THE COAL TRUST,

VERNER BERTELSEN, THOMAS E. TOWE,

DIANA WYATT, RAY PECK, BOB RANEY,

and SUE BARTLETT,

Petitioners,

v.

THE STATE OF MONTANA, and the MONTANA

DEPARTMENT OF REVENUE, and LOIS MENZIES,

in her capacity as Montana State Treasurer,

Respondents.

ORIGINAL PROCEEDING

COUNSEL OF RECORD:

For Petitioners:

James H. Goetz (argued), Robert K. Baldwin, and Richard J. Dolan,

Goetz, Gallik, Baldwin & Dolan, P.C.; Bozeman, Montana

For Respondent:

Brendan R. Beatty (argued), David W. Woodgerd,

Montana Department of Revenue; Helena, Montana

For Amici Curiae:

John E. Bloomquist and Colleen Coyle, Doney, Crowley, Bloomquist

& Uda, P.C.; Helena, Montana; Robert M. McCarthy, Butte-Silver

Bow County Attorney; Butte, Montana

Heard and Submitted: October 12, 1999

Decided: January 20, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 The Petitioners have asked this Court to exercise original jurisdiction pursuant to Article VII, Section 2(1) of the Montana Constitution and Rule 17, M.R.App.P., and to declare House Bill 260 (HB 260), enacted during the 1999 Montana Legislative Session, unconstitutional in violation of Article IX, Section 5 of the Montana Constitution. Petitioners further request that Respondents be enjoined from diverting severance tax revenue which would otherwise go to Montana's Coal Tax Trust Fund by way of the "coal producer's license tax" created by HB 260. The Respondents concede that this is an appropriate case for the exercise of original jurisdiction, but contend that HB 260 is a lawful exercise of the legislature's taxing power and does not violate the constitution.

¶2 The following issues are presented for our consideration.

¶3 1. Is this an appropriate case in which to exercise the Supreme Court's original jurisdiction?

¶4 2. Does HB 260 from the 1999 Session of the Montana Legislature, which creates a license tax on the production of coal and allocates the revenue from that tax, violate Article IX, Section 5 of the Montana Constitution?

## FACTUAL BACKGROUND

¶5 In 1975, the legislature passed SB 407 which referred to the voters of Montana the issue of whether to amend their state constitution to provide for a Coal Tax Trust Fund financed by revenue from taxes on the production of coal in the state of Montana. The legislative history characterizes the position of the bill's sponsor, Senator Miles Romney as follows:

He also was invited to make a statement on his bill, which he did, saying he was seeing large sums of money being appropriated at an alarming rate and therefore felt that some of the coal tax moneys should be held inviolate in order to assure the state would have some of this money in years to come.

¶6 The referendum was placed on the ballot at the 1976 general election. In the Voter Information Pamphlet, Thomas E. Towe, Chet Blaylock, and John Driscoll gave the following argument in support of the amendment:

[I]f we are directly dependent upon all of the coal revenue to support our day-to-day expenditures we will be severely punished financially on the day when the coal no longer exists or has value.

The last session of the Montana legislature, by an overwhelming vote, has placed this proposition on the ballot. Legislators know how tempting it is to dip into the coal tax monies with this and that "worthy project" until in the distant future there is nothing to serve as a revenue generating investment base. The proposals for use of coal tax revenues have already started mounting and pressures will be placed on the next session of the legislature to carve out more and more of the tax revenues for all sorts of "worthy projects." By passing this amendment we will guarantee an endowment for the future and

avoid temptations to spend it now.

. . . .

The money from the coal tax will be available to the legislature under either system but without the establishment of the trust, legislature will be able to spend each year's income for whatever cause by a simple majority vote. With the trust, they can only dip into the principal if they can garner a 3/4 vote of each house of the legislature. Such a vote is extremely difficult to achieve without proving a compelling necessity.

¶7 The voters of Montana approved the legislature's referendum and it became Article IX, Section 5 of the Montana Constitution which provides:

The legislature shall dedicate not less than one-fourth (1/4) of the coal severance tax to a trust fund, the interest and income from which may be appropriated. The principal of the trust shall forever remain inviolate unless appropriated by vote of three fourths (3/4) of the members of each house of the legislature. After December 31, 1979, at least fifty percent (50%) of the severance tax shall be dedicated to the trust fund.

¶8 At the same time the referendum providing for a trust fund was referred to Montana's voters, the legislature, in 1975, amended coal severance tax schedules which were then found at § 84-1302, R.C.M. (1947). They have been amended several times subsequently and are currently found at § 15-35-103, MCA. That section provides that a severance tax is imposed at a rate ranging from 10 to 15 percent of the coal's value, if taken from surface mining. The percentage varies, depending on the volume of coal taken and the coal's heating quality. The value is determined for purposes of the severance tax by the contract sales price of the coal. Section 15-35-103, MCA currently provides as follows:

(1) A severance tax is imposed on each ton of coal produced in the state in accordance with the following schedule:

Heating quality Surface Underground

(Btu per pound of coal): Mining Mining

Under 7,000 10% of value 3% of value

7,000 and over 15% of value 4% of value

(2) "Value" means the contract sales price.

. . . .

(4) A person is not liable for any severance tax upon 50,000 tons of the coal that the person produces in a calendar year, except that if more than 50,000 tons of coal are produced in a calendar year, the producer is liable for all severance tax upon all coal produced in excess of the first 20,000 tons.

¶9 In *Commonwealth Edison Company v. State* (1980), 189 Mont. 191, 195, 615 P.2d 847, 849, we explained that the 1975 amendment which increased the rate of the coal severance tax "was a response to the meteoric increase in strip-mined coal entrepreneurs in the state in the 1970s." We pointed out that the amount of coal strip-mined in Montana had gone from 6,983,186 tons in 1971 to 32,545,071 tons in 1979. *Commonwealth*, 189 Mont. at 195, 615 P.2d at 849. We also noted the 1976 Amendment which established the Coal Tax Trust Fund and attempted to put these statutory and constitutional changes in the following historical perspective:

This Court notes in passing our impression that the 1975 coal severance tax provisions, and the 1976 constitutional amendment, were in part responses to the historical experience of Montana with respect to the inadequacy of earlier forms of taxes on mineral production. In 1965, the Hon. James Felt rose in the State House of Representatives to complain that the richest hill on earth (Butte) had paid not a dime in net proceeds tax the previous year. Some modifications in computation agreed to by the mining company ameliorated that condition in subsequent years. Nevertheless, Montana's experience had shown that its mineral wealth could be exhausted and exported with little left in Montana to make up the loss of its irreplaceable resources. Montana has been painfully educated about the extreme economic jolts that follow when the mine runs out, the oil depletes, or the timber saws come still. We have a good many examples that teach us what happens to our hills when the riches of our Treasure State are spent. For these and other reasons, when strip coal mining was beginning to burgeon, in 1975, the legislature moved to fix a tax that would provide both for the present and the future when the coal deposits were gone.

*Commonwealth, 189 Mont. at 196, 615 P.2d at 850.*

¶10 In *Commonwealth* we also described the severance tax as follows:

The Montana coal severance tax is levied at the time the coal is separated by the producer from the realty in Montana, and at its value when sold by the producer in Montana. Section 15-35-103, MCA

*Commonwealth, 189 Mont. at 196-97, 615 P.2d at 850. On that basis we held that it was a tax on an activity conducted solely within the boundaries of Montana and therefore, not an interference with interstate commerce. Commonwealth, 189 Mont. at 198, 615 P.2d at 851.*

¶11 In 1981 and subsequently, the legislature divided the trust established pursuant to Article IX, Section 5 into various funds with dedicated purposes. *See* § 17-5-703, MCA (1981). We held that so long as the legislature did so, by a three-fourths vote of each house, it had the right to do so. *See Grossman v. State Dep't of Natural Resources* (1984), 209 Mont. 427, 448, 682 P.2d 1319, 1330.

¶12 The Coal Tax Trust Fund has been frequently targeted as a source of funding for popular programs since then, but usually without success. For example, in 1995 it was reported that:

Finally, the House rejected a plan by Gov. Marc Racicot (R) to divert $10 million per year of coal taxes from the coal tax trust fund into public works projects and historic preservation. The trust fund, now holding more than $500 million, has become a popular target in recent years of those trying to balance the budget, but the three-fourths vote requirement has so far prevented a raid on its funds.

Samantha Sanchez, *Montana Lawmakers Move on Tax Cuts for Business Equipment, Real Property*, State Tax Today, March 30, 1995.

¶13 Substantial principal has now accumulated in the coal trust. The amount is presently more than $618 million. *See* 1996-98 Mont. Dep't of Revenue Biennial Rep., at p. 17. Furthermore, the interest from the fund finances many important state programs. *See* § 17-5-703, MCA.

¶14 During the 1999 session of the Montana Legislature, HB 260 was introduced. In Section 4 of its original form it amended § 17-5-703, MCA, to add a research and commercialization trust fund by transferring $100 million from the coal severance tax permanent fund. It appropriated income from the new fund for research and commercialization projects. The stated purpose as set forth in Section 1 was to: (a) provide

a predictable and stable source of funding for research and commercialization projects, (b) expand and strengthen research efforts for the State's basic industries, and (c) diversify and strengthen the State's economic security through the creation of technology-based operations. In an explanatory paragraph the proponents of HB 260 in its original form, explained that providing funds for research and commercialization projects was consistent with the purpose behind the coal severance tax and the Coal Tax Trust Fund which was to invest in the future of Montana and its citizens.

¶15 HB 260, in its original form, failed to pass the second reading in the house of representatives. It was thereafter amended to the form in which it passed both houses of the legislature by simple majorities and was signed by the governor. It is that bill to which the Petitioners now state their objection.

¶16 In its amended form, HB 260 in Section 8, created a new tax called a "coal producer's license tax" in the amount equal to 9.17 percent of the coal's value. The new tax is now found at § 15-34-101, MCA. It specifically imposes the tax on those coal mine operators subject to the severance tax provided for at § 15-35-103, MCA. However, Section 7 of HB 260 which is now found at § 15-34-104, MCA, provides each coal mine operator subject to the new license tax, a credit against the severance tax equal to 101.5 percent of the license tax. Those statutes as enacted, now provide as follows:

**15-34-101. Coal producer's license tax-definition. (1) There is imposed on each coal mine operator that is subject to the tax imposed under 15-35-103 a tax in an amount equal to 9.17% of the value of coal produced in the state.**

(2) The proceeds of the tax must be allocated as provided for in 15-34-115.

(3) For purposes of this section, "value" has the meaning provided in 15-35-103.

. . . .

**15-34-104. Credit against severance tax.** A coal mine operator is entitled to a credit against the tax imposed under 15-35-103 in an amount equal to 101.5% of the amount of license tax paid under 15-34-101. The credit may not be claimed for coal produced prior to July 1, 1999.

¶17 Section 16 of HB 260 which is now found at §15-34-115, MCA, provides that the license taxes collected must first be allocated to satisfy coal severance tax bonds and coal

severance tax school bonds in the event that coal severance tax receipts are insufficient to do so. However, any excess amount is allocated for various purposes including a research and commercialization expendable trust fund created in Section 2 (now § 90-3-1002, MCA). Section 18 of HB 260 (§ 2-15-1819, MCA) created a board of research and commercialization technology, attached to the Department of Commerce for the purpose of determining how to invest funds from the research and commercialization expendable trust.

¶18 Montanans for the Coal Trust (MCT) is a nonprofit corporation whose principal purpose is to protect and preserve the coal trust provided for in Article IX, Section 5, of the Montana Constitution. It is one of the Petitioners before the Court. The others are Verner Bertelsen, Thomas E. Towe, Diana Wyatt, Ray Peck, Bob Raney, and Sue Bartlett. They are all legislators or former legislators; Bertelsen and Raney, and Towe are current and former officials in MCT, respectively; all the individuals are taxpayers in Montana; and all claim a strong interest in the preservation of the Montana Coal Tax Trust Fund.

¶19 The Petitioners allege, among other constitutional claims, that the newly enacted license tax is just a severance tax by another name and that because HB 260 diverts severance taxes from the Coal Tax Trust Fund without a three-fourths vote in both houses of the legislature, it violates Article IX, Section 5, of the Montana Constitution.

¶20 The State responds that HB 260 does not violate Article IX, Section 5 because it neither prevents the deposit of 50 percent of the coal severance tax into the coal trust, nor does it appropriate the principal of the trust. The State contends that HB 260 simply creates a new tax which the legislature has the authority to do pursuant to Article VIII, Section 2 of the Montana Constitution.

## ISSUE NO. 1

¶21 Is this an appropriate case in which to exercise the Supreme Court's original jurisdiction?

¶22 Although the parties agree that this is an appropriate case for the Court's exercise of original jurisdiction, original jurisdiction cannot be bestowed by agreement. Therefore, some brief analysis is necessary.

¶23 HB 260 became effective on July 1, 1999. Petitioners contend that because money

which would otherwise go to the Coal Tax Trust Fund will be diverted from that date forward to other programs in violation of the constitutional requirements set forth at Article IX, Section 5, there is financial urgency to the resolution of this issue, a clear and adequate remedy does not exist by appeal, and this is an appropriate case for the exercise of the Court's declaratory judgment authority pursuant to § 27-8-202, MCA; *Grossman*, 209 Mont. at 436, 682 P.2d at 1324; and *Butte-Silver Bow Local Gov't v. State* (1989), 235 Mont. 398, 401-02, 768 P.2d 327, 329.

¶24 The State agrees that the Petitioners have standing as taxpayers to bring this action pursuant to *Butte-Silver Bow* and that the facts in this case satisfy the three-part test for the exercise of original jurisdiction pursuant to Rule 17, M.R.App.P., set forth in *State ex rel. Gould v. Cooney* (1992), 253 Mont. 90, 92, 831 P.2d 593, 594. Specifically, the State contends that those beneficiaries of the revenue produced by the new license tax require a determination that the funds are legally available in order to receive federal matching funds and that time is of the essence.

¶25 In *Butte-Silver Bow* the petitioners asked this Court to exercise original jurisdiction and issue a declaratory judgment that the Montana Resource Indemnity Trust Act (1973) was unconstitutional because it authorized expenditure of resource indemnity trust funds for purposes other than the reclamation of lands disturbed by the taking of natural resources. *Butte-Silver Bow*, 235 Mont. at 400, 768 P.2d at 328. We noted that it was appropriate to exercise original jurisdiction where standing is established and the three-part test for original jurisdiction is satisfied. We held that standing is established by the following:

Further, a taxpayer will have standing to question the validity of a tax, or the expenditure of the tax monies, provided the issue(s) presented directly affect the constitutional validity to collect or use the proceeds of the tax by the state or local government entity.

*Butte-Silver Bow, 235 Mont. at 401, 768 P.2d at 329 (citing Grossman, 209 Mont. at 438-39, 682 P.2d at 1325). "Individual petitioners meet the criteria necessary to establish standing both as registered voters and as affected taxpayers . . . ." Butte-Silver Bow, 235 Mont. at 401, 768 P.2d at 329.*

¶26 We conclude that the individual Petitioners in this case satisfy the standing requirements for the same reason. They are registered voters and affected taxpayers.

¶27 Once standing has been established, we next consider whether the subject of the petition is appropriate for the exercise of original jurisdiction. In *Butte-Silver Bow* we

explained that:

Once standing to bring the action is established, the question shifts to whether the action meets the necessary factors for this Court to accept original jurisdiction. This Court has found that an assumption of original jurisdiction is proper when: (1) constitutional issues of major statewide importance are involved; (2) the case involves pure legal questions of statutory and constitutional construction; and (3) urgency and emergency factors exist making the normal appeal process inadequate. *State ex rel. Greely v. Water Court, State of Montana* (1984), 214 Mont. 143, 691 P.2d 833; Rule 12, M.R.App.P. Moreover, this Court clearly stated the Court has original jurisdiction to accept declaratory judgment proceedings "where the issues have impact of major importance on a statewide basis, or upon a major segment of the State, and where the purpose of the declaratory judgment proceedings will serve the office of a writ provided by law . . . ." *Grossman v. State Dep't of Natural Resources* (1984), 209 Mont. 427, 436, 682 P.2d 1319, 1324.

*Butte-Silver Bow, 235 Mont. at 401-02, 768 P.2d at 329.*

¶28 We conclude that the circumstances in this case satisfy the three-part test for the exercise of original jurisdiction. First, the issue presented is whether HB 260 violates Article IX, Section 5 of the Montana Constitution. Whether, in fact, coal severance taxes are being illegally diverted from the Coal Tax Trust Fund is an issue of major statewide importance.

¶29 Second, there are no disputed facts. The issues presented are of purely statutory and constitutional construction.

¶30 Third, the normal appeal process would be inadequate. The resolution of the legal issues presented is urgent to both parties for different reasons. From the Petitioners' perspective, prolonged litigation would aggravate what they consider an illegal diversion of coal severance taxes from the Coal Tax Trust Fund. From the Respondents' perspective, uncertainty about the validity of HB 260 defeats the worthwhile purposes for which license tax revenue has been allocated.

¶31 Finally, we conclude, as the Court did in *Grossman*, that the relief sought in this case if Petitioners are successful, would have the force and effect of a writ of prohibition against state officers and is, therefore, a legitimate purpose for which original jurisdiction may be exercised. *See Grossman* 209 Mont. at 435, 682 P.2d at 1323.

¶32 We, therefore hold, as we did in *Grossman* and *Butte-Silver Bow*, that this Court does have original jurisdiction to entertain the Petitioners' petition for declaratory judgment because it does have impact of major importance on a statewide basis and on a major segment of the state.

## ISSUE NO. 2

¶33 Does HB 260 from the 1999 session of the Montana Legislature, which creates a license tax on the production of coal and allocates the revenue from that tax, violate Article IX, Section 5 of the Montana Constitution?

¶34 The Petitioners contend that HB 260 violates Article IX, Section 5 because it violates the requirement that 50 percent of coal severance taxes be dedicated to the Coal Tax Trust Fund. Petitioners contend that by creating a new tax called a "license tax" on the same taxable event for which the severance tax is imposed (the production of coal) and by then providing a credit against the severance tax in an amount slightly greater than the amount of the license tax, the legislature has simply diverted, what in substance and character are severance taxes, to purposes other than the Coal Tax Trust Fund in violation of the constitution.

¶35 The State responds that HB 260 does not violate Article IX, Section 5 because the legislature has the authority pursuant to Article VIII, Section 2 of the Montana Constitution to create new taxes; HB 260 simply creates a new tax and allows for credit against the coal severance tax; and HB 260 does not prevent the deposit of 50 percent of coal severance taxes into the Coal Tax Trust Fund. The State contends that Article IX, Section 5 does not specify a rate at which the severance tax must be assessed; that the legislature could, therefore, have reduced the rate of the severance tax and has in fact done so in the past; and, that by providing a credit for coal license taxpayers against the severance tax, that is in effect what it did with HB 260.

¶36 A better characterization of the issue in this case is whether a tax that looks, acts, and affects coal producers like a severance tax is something else because it is called a license tax.

¶37 Montana's severance tax found at § 15-35-103, MCA is imposed on the production of coal and is based on a percentage of the contract sales price depending on the coal's heating quality.

¶38 The license tax is imposed on the same taxable event (the production of coal) at a slightly lesser percentage of the same contract sales price and a credit is provided against the severance tax. The requirements for quarterly statements and payment, the penalties for delinquency, the methods for crediting overpayment and assessing deficiencies, and the statutes of limitation are similar under each statute. *Compare* § 15-34-102 to § 15-35-104, MCA, § 15-34-103 to §15-35-105, MCA, § 15-34-105 to § 15-35-113, MCA, § 15-34-110 to 15-35-112, MCA, and § 15-34-111 to § 15-35-114, MCA. The only substantial difference between the two taxes, is the purpose for which each is allocated. *Compare* § 15-34-115 to § 15-35-108, MCA. Fifty percent of the total coal severance tax collections are allocated to the trust fund created by Article IX, Section 5 of the Montana Constitution. There is no similar requirement for taxes collected as license taxes.

¶39 The Petitioners' argument is based on the substance and effect of HB 260. The State's response is based on the label given to the tax created by HB 260. However, we are guided by constitutional case law which instructs that legislation which appears constitutional on its face may be invalid if its effect violates a provision of the constitution.

¶40 For example, in *Oliver Iron Co. v. Lord* (1923), 262 U.S. 172, 43 S. Ct. 526, 67 L. Ed. 929, when the United States Supreme Court was called upon to determine whether a tax imposed on the production of iron ore in Minnesota was an "occupation tax" or a "property tax" as argued by the mining companies on whom the tax was imposed, the Supreme Court looked to the nature of the activity on which the tax was imposed. In concluding that it was properly "an occupation tax" the Supreme Court observed that:

It is not laid on land containing the ore, nor on the ore after removal, but on the business of mining the ore, which consists in severing it from its natural bed and bringing it to the surface where it can become an article of commerce and utilized in the industrial arts.

*Oliver Iron Co., 262 U.S. at 176-77, 43 S. Ct. at 528-29.*

¶41 In other words, according to the Supreme Court, the nature of the activity taxed is more significant to the characterization of the tax than the label assigned to it. We have similarly described the activity on which Montana's severance tax is imposed in response to a similar challenge to that tax based on the commerce clause of the United States Constitution. *See Commonwealth*, 189 Mont. at 197, 615 P.2d at 850.

¶42 In *Gomillion v. Lightfoot* (1960), 364 U.S. 339, 81 S. Ct. 125, 5 L. Ed. 2d 110, the

Supreme Court was asked to decide whether a legislative act by the state of Alabama, which redefined the boundaries of the city of Tuskegee to exclude most African American citizens from residency within Tuskegee, violated various provisions of the United States Constitution including the Fifteenth Amendment which guarantees citizens the right to vote regardless of color. The State of Alabama contended that it had the constitutional authority to reorganize its political subdivisions. While recognizing that aspect of a state's political power the Supreme Court noted that:

When a state exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right. . . . "Acts generally lawful may become unlawful when done to accomplish an unlawful end, *United States v. Reading Co.*, 226 U.S. 324, 357, 33 S. Ct. 90, 57 L. Ed. 2d 243, and a constitutional power cannot be used by way of condition to attain an unconstitutional result." *Western Union Telegraph Co. v. Foster*, 247 U.S. 105, 114, 38 S. Ct. 438, 439, 62 L. Ed. 1006.

*Gomillion, 364 U.S. at 347-48, 81 S. Ct. at 130.*

¶43 In *Department of Revenue of Montana v. Kurth Ranch* (1994), 511 U.S. 767, 114 S. Ct. 1937, 127 L. Ed. 2d 767, the Supreme Court was called upon to look at the substance of Montana's tax on the possession of illegal drugs and determine whether it was, in fact, a criminal penalty in addition to a previously imposed penalty and in violation of the constitutional prohibition against successive punishments for the same offense. The Court noted that a legislature's label for a statute is less significant than its effect when deciding its constitutionality. *Kurth*, 511 U.S. at 777, 114 S. Ct. at 1944-45. And that:

"[T]here comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment."

*Kurth, 511 U.S. at 779, 114 S. Ct. at 1946 (citing Child Labor Tax Case (1922), 259 U.S. 20, 38, 42 S. Ct. 449, 451, 66 L. Ed. 817).*

¶44 The Supreme Court concluded that because of the high rate at which the drug tax was imposed, the purpose of deterrence for which it was imposed, the fact that it is conditioned on the commission of a crime, and that it is levied on goods that the taxpayer neither owns nor possesses, it was too far removed from the typical characteristics of a tax to escape

characterization as a punishment. *Kurth*, 511 U.S. at 780-83, 114 S. Ct. at 1946-48.

¶45 From these authorities we know that taxes on the production of natural resources are characterized by the nature of activity on which the tax is imposed, the effect of a legislative assessment is more important than its label for purposes of determining its character, and acts generally lawful, i.e., the legislative imposition of a tax, can become unlawful when done to accomplish an unlawful end, i.e., the diversion of severance tax revenue for an unconstitutional purpose.

¶46 Furthermore, we know that both the "license" tax provided for at § 15-34-101, MCA, and the severance tax provided for at § 15-35-103, MCA, are "production based" taxes on production of the same natural resource. Walter Hellerstein, a national authority on local taxation of natural resources, when discussing production taxes notes that:

Such taxes have been variously labeled by legislatures and referred to in popular or academic discourse as production taxes, *severance taxes*, occupation taxes, *license taxes*, privilege taxes, gross proceeds taxes, gross receipts taxes, and net proceeds taxes.

*See Walter Hellerstein, State and Local Taxatio of Natural Resources in the Federal System, Legal, Economic, and Political Perspectives, American Bar Association, p. 31, n.13 (1986) (emphasis added).*

¶47 Hellerstein then notes that regardless of the label placed on production taxes, they are imposed for the same purpose. He states:

The most characteristic levies imposed specifically on natural resources are production taxes, a category defined here to embrace all exactions, however denominated, that are imposed on any event or activity associated with natural resource production and that are measured by the value and quantity of the resource produced. Such levies are frequently called *severance* or production taxes, but they are also labeled as privilege, *license*, occupation, conservation, and other measures.

*Id. at 55 (emphasis added).*

¶48 The State contends that the legislature had the authority to reduce the percentage of the coal severance tax and that that is what in effect it did by providing a credit against the coal severance tax for the amount of the coal license tax. We agree that the legislature has the authority to determine the percentage of the coal severance tax. However, in this case, the legislature did not reduce the coal severance tax. It simply gave a different name to the

same tax and thereby diverted severance tax revenue to "worthwhile causes" other than the Coal Tax Trust Fund.

¶49 The State contends that other mining taxes are also based on the contract sales price of coal, including the coal gross proceeds tax (§§ 15-23-701, et seq., MCA) and the resource indemnity trust tax (§§ 15-38-101, et seq., MCA), and that the general fund stabilization tax (§ 15-1-516, MCA (1992)) placed a 7 percent tax on the liability computed pursuant to § 15-35-103, MCA, and that all proceeds are deposited in the general fund. Its argument continues that because it is not constitutionally required that any of these taxes be deposited in the Coal Tax Trust Fund, neither is there any such requirement for the coal license tax, simply by virtue of the fact that it is a tax on coal production. However, the distinction is that none of the resource taxes cited by the State divert revenues from the Coal Tax Trust Fund by providing a credit against the coal severance tax based on revenue generated by a tax on the identical activity for which the severance tax is imposed.

¶50 The State's argument that the purpose of HB 260 was something other than to divert severance tax revenue from the Coal Tax Trust Fund is equally unpersuasive. House Bill 260, in its original form, was an effort to set aside a portion of the Coal Tax Trust Fund for economic development purposes. When that effort failed, the bill was amended to divert revenue which would otherwise go to the Coal Tax Trust Fund to create a source of funding for the same purpose which was not subject to the same constitutional restrictions.

¶51 We conclude, therefore, that the tax created by HB 260 in the 1999 Legislative Session is, in substance, a coal severance tax because it is imposed on the extraction or production of coal from Montana real estate, based on the market value of that coal. We further conclude, that by diverting and allocating the revenue from that tax, contrary to the requirement in Article IX, Section 5, that 50 percent be dedicated to the Coal Tax Trust Fund and by doing so without a three-fourths vote of each house of the legislature, HB 260 violated the Montana Constitution. For that reason, the Respondents are enjoined from the further enforcement of HB 260 as specifically provided at §§ 15-34-101, -104 and -115, MCA.

## SUMMARY

¶52 Montana's Constitution recognizes that this State's natural resources are exhaustible; that the revenue from those resources is finite; and that the best way to preserve the benefit from those resources for the State's and its citizens' posterity, is to preserve and grow the

trust fund that those resources have produced. The best way to preserve and grow the trust fund is to place it beyond the reach of those who would convert it to finance normal operations of government no matter what the short-term merit of those transient purposes. The people of this State have chosen to do so by way of Article IX, Section 5 and its requirement that 50 percent of severance taxes be placed in the Coal Tax Trust Fund and not spent without approval by three-fourths of both houses of the legislature.

¶53 Severance taxes are dedicated to the Coal Tax Trust Fund. A severance tax by any other name is just as dedicated.

¶54 Our conclusion today, is based purely on that constitutional requirement. It is in no way an effort to pass judgment on the merits of the purposes for which HB 260 was passed. However, we conclude that those objectives cannot be accomplished in violation of Article IX, Section 5 of the Montana Constitution.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

Chief Justice J. A. Turnage, dissenting.

¶55 I respectfully dissent from the majority's conclusion that the Coal Producer's License Tax is unconstitutional.

¶56 Analysis of the substantive issue presented in this case must begin with the presumption that all legislative enactments are constitutional. *Roosevelt v. Montana Dept. of Revenue*, 1999 MT 30, ¶ 26, 293 Mont. 240, ¶ 26, 975 P.2d 295, ¶ 26. The party challenging the constitutionality of a statute bears the burden of proving the statute unconstitutional beyond a reasonable doubt. *Roosevelt* at ¶ 26.

¶57 Article IX, Section 5 of the Montana Constitution provides:

The legislature shall dedicate not less than one-fourth (1/4) of the coal severance tax to a trust fund, the interest and income from which may be appropriated. The principal of the trust shall forever remain inviolate unless appropriated by vote of three-fourths (3/4) of the members of each house of the legislature. After December 31, 1979, at least fifty percent (50%) of the severance tax shall be dedicated to the trust fund.

The above language requires that fifty percent of all <u>Coal Severance Tax</u> must be deposited in trust with the principal remaining inviolate unless appropriated by a vote of three-fourths of the members of each house of the legislature. I submit that these provisions are not violated by H.B. 260.

¶58 There are no provisions in the Montana Constitution that limit the constitutional authority of the Montana legislature, by a majority vote, to eliminate the Coal Severance Tax in its entirety. The above constitutional language does not specify a rate at which the Coal Severance Tax must be assessed, nor does it require that such a tax be imposed. Therefore, most certainly the legislature has the authority under the Constitution to reduce the Coal Severance Tax.

¶59 The indirect effect of H.B. 260 is to reduce the rate at which the Coal Severance Tax is assessed. Because this result could constitutionally be accomplished by direct legislative action, as the Court concedes, I see no reason why it becomes unconstitutional when it is an indirect result of legislative action.

¶60 The fact that H. B. 260's Coal Producer's License Tax is based upon the contract sales price of coal produced in Montana does not make this tax into the Coal Severance Tax. Other mining-related taxes are also based upon the contract sales price. Both the Coal Gross Proceeds Tax, §§ 15-23-701 through -707, MCA, and the Resource Indemnity Trust Tax, §§ 15-38-101 through -129, MCA, are based on the same "contract sales price" as the Coal Severance Tax and the Coal Producer's License Tax. Nor does the distinction upon which the majority relies, that the Coal Producer's License Tax provides a tax credit against the Coal Severance Tax whereas the other mining-related taxes do not, create a violation of the Montana Constitution. The legislature is empowered to enact new taxes and to provide tax credits. Art. VIII, § 2, Mont. Const.; *McCray v. United States* (1903), 195 U.S. 27, 59, 49 L.Ed. 78, 97, 24 S.Ct. 769, 778. Article IX, Section 5 of the Montana Constitution does not prevent the legislature from enacting a new tax on coal producers

and providing a credit against the Coal Severance Tax.

¶61 Article III, Section 1, of the Montana Constitution provides:

**Separation of powers.** The power of the government of this state is divided into three distinct branches-legislative, executive, and judicial. No person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

Article VIII, Section 2, provides:

**Tax power inalienable.** The power to tax shall never be surrendered, suspended, or contracted away.

Article VIII, Section 9, provides:

**Balanced budget.** Appropriations by the legislature shall not exceed anticipated revenue.

Clearly the provisions of Article III, Section 1 and Article VIII, Sections 2 and 9 place the constitutional authority for taxation and appropriation exclusively in the legislative branch of Montana government.

¶62 The majority in this Opinion has ignored the longstanding precedent that legislative enactments are presumed constitutional, and in doing so has likewise ignored the constitutional doctrine of separation of powers by exercising a power of the judiciary in an area properly belonging to the legislative branch of Montana government.

¶63 I would hold that H.B. 260 enacted in the 1999 legislative session is constitutional. Therefore, I respectfully dissent.

_____

/S/ J. A. TURNAGE

Justice Karla M. Gray concurs in the dissenting opinion of Chief Justice Turnage.

/S/ KARLA M. GRAY