DA 09-0510

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 267

STATE OF MONTANA, EX REL. DEPARTMENT
OF ENVIRONMENTAL QUALITY,

　　　　Plaintiff and Appellant,

　　v.

BNSF RAILWAY COMPANY,

　　　　Defendant, Appellee and Cross-Appellant.

APPEAL FROM:　　District Court of the First Judicial District,
　　　　　　　　In and For the County of Lewis and Clark, Cause No. BDV 04-596
　　　　　　　　Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

　　　　For Appellant:

　　　　　　R. Allan Payne and Marc G. Buyske; Doney, Crowley, Bloomquist,
　　　　　　Payne, Uda, P.C., Helena, Montana

　　　　　　Cynthia D. Brooks, Special Assistant Attorney General, Montana Department
　　　　　　of Environmental Quality, Helena, Montana

　　　　For Appellee:

　　　　　　Chad Adams, Oliver Goe, and Leo Berry; Browning, Kaleczyc, Berry &
　　　　　　Hoven, P.C., Helena, Montana

　　　　　　Paul Lawrence, K&L Gates, LLP, Seattle, Washington

　　　　　　　　　　　　Submitted on Briefs:　July 21, 2010
　　　　　　　　　　　　　　　　Decided:　December 21, 2010

Filed:

_____
　　　　　　　　　Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1     The Montana Department of Environmental Quality (DEQ) brought suit under Montana's Comprehensive Environmental Cleanup and Responsibility Act (CECRA), seeking to compel BNSF Railway Company (BNSF) to abate contamination at three former industrial sites. The First Judicial District Court, Lewis and Clark County, found BNSF jointly and severally liable for contamination as an owner, past owner and operator, and arranger under CECRA. The court ordered BNSF to abate the contamination but did not order that abatement occur pursuant to DEQ's Record of Decision (ROD). DEQ appeals and BNSF cross-appeals. We affirm.

¶2     We review the following issues on direct appeal:

¶3     *Whether the District Court erred when it ruled that BNSF is not required to comply with DEQ's ROD until the ROD is approved by the District Court.*

¶4     *Whether the District Court erred when it determined that apportionment was a defense under CECRA.*

¶5     *Whether the District Court erred when it dismissed DEQ's public nuisance claim.*

¶6     *Whether the District Court abused its discretion when it allowed Pat Keim to testify as an expert.*

¶7     For reasons discussed below, we do not reach the merits of the second and fourth issues raised by DEQ.

¶8     We restate and review the following issues on cross-appeal:

2

¶9 *Whether the District Court erred when it concluded that BNSF was liable for contamination as an arranger.*

¶10 *Whether the District Court erred by allowing DEQ to pursue both administrative and judicial remedies under CECRA.*

¶11 *Whether the District Court abused its discretion when it approved a consent decree entered into by other stakeholders.*

¶12 *Whether the District Court erred by failing to reduce BNSF's liability after other defendants had settled.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶13 This case involves three adjoining facilities listed as state Superfund sites under § 75-10-704, MCA: 1) the Kalispell Pole and Timber (KPT) site, a former wood treatment plant; 2) the Reliance Refining Company (Reliance) site, a former crude oil refinery; and 3) the Yale Corporation site, a former crude oil refinery and petroleum storage site. These sites are located near the Stillwater River north of Kalispell. The first two sites are the subject of this appeal.

¶14 BNSF and its predecessors leased property to KPT from 1945 to 1990. KPT used the property to treat wood poles. As a result of its operations, KPT contaminated the groundwater and soil with pentachlorophenol (PCP), oils, dioxins, and furans. BNSF transported these materials to and from the KPT site.

¶15 The Reliance site is adjacent to and located to the east of the KPT site. The facility was used by various companies over the course of forty years to refine crude oil into

3

gasoline, kerosene, and diesel. BNSF transported petroleum products into and out of the site. Some BNSF railroad cars arrived at the Reliance site "leaking badly." Refinery workers occasionally "got a soaking" when unloading crude oil from BNSF cars. Moreover, when shipments of crude oil arrived and the holding tanks were full, the crude oil was dumped onto the ground in pools on BNSF property in the area. The District Court found that BNSF had been involved in dumping petroleum products onto the surface of the earth. The Reliance site has been further contaminated by PCP and petroleum products from the KPT site.

¶16 DEQ filed suit against seven defendants, including BNSF, in 2004 to require the defendants to abate the contamination at all three facilities, to recover past and future remedial action costs, and to obtain a declaratory ruling. DEQ asserted various statutory causes of action under CECRA and also raised several common law causes of action. DEQ subsequently entered into consent decrees with the other defendants, which the District Court approved.

¶17 DEQ eventually obtained two CECRA abatement orders under § 75-10-711(8), MCA, that required BNSF to abate "the imminent and substantial endangerment to the public health, welfare, and safety, and the environment." The first abatement order was issued after the District Court had granted summary judgment to DEQ on the issue of BNSF's liability for the KPT site. The second abatement order was issued after a bench trial on BNSF's liability for the Reliance site. The court ultimately determined that BNSF was jointly and

4

severally liable for contamination at the KPT and Reliance sites. The District Court combined these two orders into a Final Unified Abatement Order.

¶18 DEQ issued its ROD on June 30, 2008. The ROD sets forth DEQ's plan to abate the contamination. The ROD accounts for the many complicated factors that DEQ is required to consider pursuant to § 75-10-721, MCA. In essence, the ROD is the product of a lengthy study and review process that requires on-site investigations, evaluations of field data, determinations of appropriate cleanup levels, feasibility studies, and public comment. The substance of the ROD is not subject to review on appeal in this case.

¶19 BNSF appealed the ROD in another district court. BNSF contends that DEQ acted arbitrarily and capriciously in issuing its decision. At the time the District Court issued its final order in this case, however, BNSF's appeal of the ROD was still pending.

¶20 The District Court observed that "the ROD is a highly technical document that will provide assistance to BNSF and DEQ in complying with their abatement responsibilities." The court noted that, on the one hand, "it would be unfair to impose the ROD on BNSF when in fact parts or all of the ROD may ultimately change," and, on the other hand, "the ROD will provide the parties with valuable technical guidance in complying with the requirements of abatement."

¶21 The District Court ultimately concluded that "it would be unfair to BNSF to require it to comply with the ROD since it was never presented prior to this Court's Order and is currently on appeal." Although the court stated that it would incorporate the ROD "in whatever final form it takes when it is finally approved by a court of competent jurisdiction,"

5

the court determined that "this ruling is the best way to safeguard the interests of both parties."

¶22 DEQ appeals. BNSF cross-appeals.

**STANDARDS OF REVIEW**

¶23 We review a district court's findings of fact for clear error. *In re Charles M. Bair Family Trust*, 2008 MT 144, ¶ 28, 343 Mont. 138, 183 P.3d 61 (citing *Slauson v. Bertelsen Family Trust*, 2006 MT 314, ¶ 10, 335 Mont. 43, 151 P.3d 866). We review a district court's conclusions of law for correctness. *Id.*

¶24 The parties agree that we should review a decision by a district court to approve a CECRA consent decree for abuse of discretion. We hereby adopt this standard.

**DISCUSSION**

¶25 *Whether the District Court erred when it ruled that BNSF is not required to comply with DEQ's ROD until the ROD is approved by the District Court.*

¶26 DEQ maintains that the ROD is entitled to deference and is presumed valid "**unless and until** the reviewing court finds the agency acted arbitrarily and capriciously in issuing its decision and remands it to the agency for further action." (Emphasis in original.) According to DEQ, the District Court "overstepped" its authority when it held that BNSF did not have to comply with the ROD until the ROD had received judicial approval.

¶27 For its part, BNSF argues that the District Court has broad powers under CECRA to fashion "equitable relief" by ordering a party to abate contamination. BNSF further maintains that CECRA does not "confine a district court's equitable powers by requiring that

6

relief incorporate a cleanup decision subsequently issued by DEQ." BNSF argues that CECRA requires only that the court should order defendants to facilitate abatement of the imminent and substantial endangerment caused by the contamination. BNSF also maintains that DEQ's argument should fail because it never made a specific request to the District Court to order BNSF to comply with the ROD.

¶28 The District Court did not err. The District Court ordered BNSF to abate the contamination at the KPT and Reliance sites, which is precisely what DEQ requested. That ruling was not appealed. Rather, DEQ appeals *how* the abatement must occur. DEQ maintains that abatement must occur according to its ROD. The propriety of the ROD is not before this Court, nor was it before the District Court. The ROD is the subject of a separate legal proceeding in the district court. While we may deal with the ROD in the future, we will not do so now. The District Court ordered BNSF to abate the contamination. Whether or not the ROD is final, BNSF must abate; the sooner the better. DEQ received what it requested in the proceeding below – a court order requiring BNSF to abate. The District Court declined to incorporate the ROD into its decision because it is subject to judicial review in a separate action. The District Court ordered BNSF to continue to abate the contamination at the KPT site, as it had been doing, and to begin abating the contamination at the Reliance site, pending final ruling on the ROD in the other proceeding. The District Court acted within its authority under § 75-10-711(8), MCA, on the issue before it. There was no error.

7

¶29     *Whether the District Court erred when it determined that apportionment was a defense under CECRA.*

¶30     DEQ takes issue with the District Court's Order on Pre-Trial Motions, in which the court stated that if "DEQ proves BNSF's liability for surface contamination at the Reliance Site, BNSF must come forward with evidence to show it was only responsible for a portion of the contamination at the site to avoid the possibility of joint and several liability for all the surface contamination." BNSF was not able to make this showing, and DEQ prevailed in the District Court on this issue.

¶31     DEQ argues that CECRA provides solely for joint and several liability. Section 75-10-715, MCA, states that "notwithstanding any other provision of law, and subject only to the defenses set forth in subsection (5) and the exclusions set forth in subsection (7), the following persons are jointly and severally liable for a release or threatened release of a hazardous or deleterious substance[.]" Apportionment is not a defense or exclusion set forth in subsections (5) or (7).

¶32     We decline to address this issue on appeal. The judicial power of the courts of Montana is limited to justiciable controversies. *See e.g. Greater Missoula Area Fedn. of Early Childhood Educators v. Child Start Inc.*, 2009 MT 362, ¶ 22, 353 Mont. 201, 219 P.3d 881. "A justiciable controversy is one upon which a court's judgment will effectively operate, as distinguished from a dispute invoking purely political, administrative, philosophical or academic conclusion." *Clark v. Roosevelt County*, 2007 MT 44, ¶ 11, 336 Mont. 118, 154 P.3d 48. In this case, even if we reversed the District Court on this issue, our

8

decision would not affect the outcome. DEQ prevailed below. We accordingly do not reach the merits of DEQ's arguments with respect to this issue on appeal.

¶33 *Whether the District Court erred when it dismissed DEQ's public nuisance claim.*

¶34 The District Court based its dismissal of DEQ's public nuisance claim on three rationales. The first—that DEQ failed to establish all the elements of a public nuisance—is dispositive in this case.

¶35 Section 27-30-102(1), MCA, defines a public nuisance as "one which affects, at the same time, an entire community or neighborhood or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

¶36 DEQ argues that the District Court's findings of fact and conclusions of law with respect to this issue are inconsistent. The court found that contamination at the Reliance site posed an imminent and substantial endangerment to public health and the environment. The court also recognized that the public would be harmed if it came into contact with the contamination. The court determined that "several drinking wells within the immediate area are threatened by the groundwater plume," but that "the Reliance facility contains no residences and is not used by any party for any purpose." Lastly, the court stated that although "there is some threat to neighboring wells and at least one well has been shut down due to a PCP detection, the Court has received no complaints from any neighbors or from community leaders in Kalispell."

¶37 We recognize that the District Court found that the contamination presents an imminent and substantial endangerment to the public health, welfare, and safety and to the

9

environment. The court also noted that there was "some threat" to neighboring wells, but that DEQ had not put on evidence from neighbors or community leaders in the area. DEQ also failed to present evidence that any specific individual was affected by the contamination. After a careful review of the record, we conclude that DEQ failed to present sufficient evidence showing that the alleged public nuisance "affects, at the same time, an entire community or neighborhood or any considerable number of persons." Section 27-30-121(1), MCA. We affirm.

¶38 *Whether the District Court abused its discretion when it allowed Pat Keim to testify as an expert.*

¶39 BNSF offered the testimony of Pat Keim to testify whether releases of petroleum occurred from railcars at the Reliance site. DEQ argues that Keim's testimony was not expert testimony under M. R. Evid. 702, and that the District Court abused its discretion when it allowed Keim to testify as an expert.

¶40 The general rule is that the district court has broad discretion in determining whether a particular witness is qualified to testify as an expert. *See e.g. Harris v. Hanson*, 2009 MT 13, ¶ 18, 349 Mont. 29, 201 P.3d 151.

¶41 More importantly, however, we observe that DEQ prevailed in the District Court. As discussed above under Issue Two, reversing the District Court on this issue would have no effect on the ultimate outcome of the case. We decline to address the merits of this issue on appeal.

¶42 *Whether the District Court erred when it concluded that BNSF was liable for contamination as an "arranger."*

¶43 BNSF appeals the District Court's determination that it was liable as an arranger under § 75-10-715(1)(c). [1]

¶44 The District Court found that BNSF had moved railcars to the Reliance site located between BNSF's main railroad line and its spur line to allow Reliance employees to dump petroleum products onto the ground. The District Court concluded that BNSF was liable as an arranger because of its "involvement" with Reliance in the dumping of petroleum products.

¶45 Montana law does not define what it means to have "arranged" for disposal or treatment under CECRA. The District Court therefore relied on federal case law in concluding that BNSF was liable as an arranger. The District Court cited *United States v. Burlington N. & Santa Fe Ry. Co.*, 520 F.3d 918 (9th Cir. 2008) [hereafter *Burlington I*], *rev'd*, ___ U.S. ___, 129 S. Ct. 1870 (2009), in support of its conclusion that a broad type of arranger liability exists under CECRA. The Ninth Circuit, in interpreting the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), stated that a broad category of arranger liability exists if the "disposal of hazardous wastes [wa]s a foreseeable

---

[1] The District Court determined that BNSF is jointly and severally liable for the releases or threatened releases of hazardous or deleterious substances for three reasons. The court concluded that BNSF "owns part of the facility where hazardous or deleterious substances were disposed of," that, at the time of disposal, it "owned and operated part of the facility where the hazardous or deleterious substances were disposed of," and that it had possessed and "arranged for disposal or treatment of the substance." BNSF challenges only the District Court's conclusion that it is liable as an arranger. The District Court separately determined that BNSF was not liable as a transporter. DEQ does not challenge that determination on appeal.

11

byproduct of, but not the purpose of, the transaction giving rise to" arranger liability. *Burlington I*, 520 F.3d at 948.

¶46 However, the United States Supreme Court reversed. *Burlington N. & Santa Fe Ry. Co. v. United States*, ___ U.S. ___, 129 S. Ct. 1870 (2009) [hereafter *Burlington II*]. The Court recognized that determining whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction, but it ultimately concluded that an entity may be liable as an arranger under CERCLA when it takes "intentional steps" to dispose of a hazardous substance. *Id*. at 1879.

¶47 After *Burlington II* was decided, BNSF petitioned the District Court in this case to reconsider its holding concerning arranger liability. The District Court declined to do so. BNSF contends on appeal that the District Court's order holding BNSF jointly and severally liable as an arranger must be reversed because the court relied on Ninth Circuit precedent that was later reversed. BNSF also argues that public policy dictates that we reverse.

¶48 We note at the outset that this issue is a matter of first impression. We have had few occasions to interpret CECRA. *See BNSF Ry. Co. v. State ex rel. Dept. of Envtl. Quality*, 2010 MT 46, 355 Mont. 296, 228 P.3d 1115; *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, 338 Mont. 259, 165 P.3d 1079. Neither case dealt with arranger liability.

¶49 We reject BNSF's argument that we must reverse the District Court on this issue merely because the Ninth Circuit case upon which the District Court relied was reversed. CERCLA itself provides that states may impose additional liability or requirements under regulatory environmental laws. *See* 42 U.S.C. § 9614(a) (2006) ("Nothing in this Act shall

be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State."). At minimum, § 9614(a) provides that Montana is free to adopt a broader scope of arranger liability in interpreting CECRA than set forth by the United States Supreme Court in *Burlington II*.

¶50 After careful evaluation, we find CECRA contains a broader scope of arranger liability than CERCLA, and that broad scope best serves and promotes CECRA's stated purpose. A broad scope of arranger liability protects the environment and the public health and welfare of all Montana citizens. In other words, we do not adhere to the United States Supreme Court's interpretation of CERCLA that requires intent to dispose in order for an entity to be liable as an arranger. For the reasons set forth below, we affirm the District Court on adequate and independent state grounds.

¶51 The Montana CECRA states as follows:

(1). . .the following persons are jointly and severally liable for a release. . .

(a) a person who owns or operates a facility where a hazardous or deleterious substance was disposed of;
(b) a person who at the time of disposal of a hazardous or deleterious substance owned or operated a facility where the hazardous or deleterious substance was disposed of;
(c) a person who generated, possessed, or was otherwise responsible for a hazardous or deleterious substance and who, by contract, agreement, or otherwise, arranged for disposal or treatment of the substance or arranged with a transporter for transport of the substance for disposal or treatment; and
(d) a person who accepts or has accepted a hazardous or deleterious substance for transport to a disposal or treatment facility.

Section 75-10-715(1), MCA. The persons delineated in all four subsections of this provision

13

are liable for a "release," a statutorily defined term. "Arranger liability," a term not specifically defined in the statute, is the concept created by language in subsection (c).

¶52 "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA; *Matter of Estate of Langendorf*, 262 Mont. 123, 125-26, 863 P.2d 434, 436 (1993). "In short, it is this Court's duty to construe the law as it finds it." *State ex rel. Palmer v. Hart*, 201 Mont. 526, 530, 655 P.2d 965, 967 (1982).

¶53 Analyzing the text as we find it, there is no mention of "intent" within subsection (c), nor an indication of a legislative determination to impose arranger liability *only* when a person has taken intentional steps to dispose of a hazardous substance. Intent is not an element of any of the liabilities imposed under this provision. For example, under subsection (a), a person who merely "owns or operates a facility where a hazardous or deleterious substance was disposed of" is liable for a release, without regard to an intention to release. Therefore, intent is not, by necessity, a prerequisite for imposition of liability.

¶54 The four subsections of § 75-10-715(1), MCA, all impose liability for a "release" (". . . the following persons are jointly and severally liable *for a release*. . . ."). (Emphasis added.) As noted, "release" is a term defined by CECRA, and broadly so. Section 75-10-701(19), MCA, provides, in pertinent part, that "'Release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a hazardous or deleterious substance directly into the environment. . . ." The

14

term "dispose" is not separately defined, but is included within the definition of "release" for which arranger liability can be imposed. A review of the definition of "release" reveals that it encompasses various apparently unintentional acts, such as "escaping" or "spilling."

¶55 The term "arrange" is likewise not defined in the statute, and BNSF urges us to adopt the determination made by the United States Supreme Court that "intent to dispose" is required for imposition of arranger liability under CERCLA. However, CECRA and CERCLA are not identical in this regard. *Compare* § 75-10-715(1)(c), MCA, ("*a person who generated, possessed, or was otherwise responsible for a hazardous or deleterious substance and* who, by contract, agreement, or otherwise, arranged for disposal or treatment of the substance or arranged with a transporter . . .") (emphasis added) *with* 42 U.S.C. § 9607(a)(3) (2006) ("any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter. . . ."). In one sense, the expanded language in CECRA imposes additional conditions for imposition of arranger liability (the satisfaction of which is not contested here), but in another sense also makes clear that liability may be imposed upon persons who merely "possessed" or were "otherwise responsible" for the hazardous material, and then arranged for its disposal.

¶56 "Statutory construction is a 'holistic endeavor' and must account for the statute's text, language, structure, and object." *State v. Heath*, 2004 MT 126, ¶ 24, 321 Mont. 280, 90 P.3d 426 (citations omitted). " 'Our purpose in construing a statute is to ascertain the legislative intent and give effect to the legislative will. Section 1-2-102, MCA.' " *Heath*, ¶ 24 (citations omitted). Review of the text as a whole, particularly §§ 75-10-701(19) and 75-10-

15

715(1), MCA, reveal no legislative purpose to require "intent" as an element of arranger liability. Indeed, the terms defined or used by the statutes infer the opposite. If the Legislature deems that the element of "intent" is desirable, it can revise the statutory language. Until then, this Court is bound to "construe the law as we find it."

¶57 We find that an entity need not specifically "intend" to dispose of a hazardous substance for imposition of arranger liability. An entity may be liable as an arranger even if it did not intend to dispose of a hazardous substance.

¶58 There is no dispute that BNSF possessed or was otherwise responsible for the materials it shipped. A necessary and foreseeable consequence of shipping the material was unloading the material. The District Court found that "railroad employees moved full tank cars of crude oil . . . so that Reliance Refinery employees could dump the crude oil on the surface of the earth." Here, the record demonstrates that BNSF participated in the unloading process which resulted in the release of the materials it possessed. The District Court did not err when it concluded that BNSF was liable as an arranger.

¶59 In addition to statutory analysis, the policy rationales espoused by the Legislature support the broad scope of arranger liability and our holding discussed above. Section 75-10-706, MCA, provides that the Montana legislature enacted CECRA with the intent that CECRA "provide adequate remedies for the protection of the environmental life support system from degradation and provide adequate remedies to prevent unreasonable depletion and degradation of natural resources." That section also sets forth three stated purposes. The first purpose is to "protect the public health and welfare of all Montana citizens against the

16

dangers arising from releases of hazardous or deleterious substances." The second purpose is to "encourage private parties to clean up sites within the state at which releases of hazardous or deleterious substances have occurred, resulting in adverse impacts on the health and welfare of the citizens of the state and on the state's natural, environmental, and biological systems." The third purpose is to "provide for funding to study, plan, and undertake the rehabilitation, removal, and cleanup of sites within the state at which no voluntary action has been taken."

¶60 Montana has a long and storied history as a state founded in large part on the backs of the mining, timber, and railroad industries. Our history illustrates that natural resources run out, companies go out of business, industry practices change, and new industries emerge. *See e.g. Montanans for the Coal Trust v. State*, 2000 MT 13, ¶ 52, 298 Mont. 69, 996 P.2d 856 ("Montana's Constitution recognizes that this State's natural resources are exhaustible; that the revenue from those resources is finite; and that the best way to preserve the benefit from those resources for the State's and its citizens' posterity, is to preserve and grow the trust fund that those resources have produced."). What may have been acceptable as industry practice in years past leaves Montana's citizens grappling with contamination today.

¶61 Montana is home to sixteen established federal Superfund sites and one proposed site on the CERCLA National Priorities List. *See* EPA, *Montana Site Locator*, http://www.epa.gov/region8/superfund/mt/index.html (last updated October 12, 2010). In addition, DEQ currently manages over twenty-five CECRA sites. *See* DEQ, *Currently Managed CECRA Facilities Map*,

17

http://deq.mt.gov/StateSuperfund/PDFs/ActivelyManagedCecraFacilities.pdf (last updated Dec. 2009). For better and for worse, many companies in the business of natural resource development leave evidence of their practices in Montana long after such companies cease to exist.

¶62 Montana's unique governing body of law reflects the value that Montanans place on protection, promotion, and restoration of the environment. The Montana Constitution provides that all persons have a "right to a clean and healthful environment." Mont. Const. art. II, § 3. The right to a clean and healthful environment constitutes a fundamental right. *Sunburst*, ¶ 61.

¶63 A broad scope of arranger liability best serves CECRA's stated purpose to protect the public health and welfare of all Montana citizens against the dangers arising from releases of hazardous or deleterious substances. Moreover, a broad scope of arranger liability will allow DEQ to address contamination in the most effective manner possible.

¶64 For these reasons, we decline to adopt the United States Supreme Court's interpretation of CERCLA in *Burlington II*. Rather, mindful of CECRA's statutory language and stated purposes, we hold that CECRA provides for broad arranger liability which does not require intent to dispose of a hazardous substance for imposition of arranger liability.

¶65 *Whether the District Court erred by allowing DEQ to pursue both administrative and judicial remedies under CECRA.*

¶66 DEQ sent BNSF a letter in 1995 informing BNSF that the Montana Department of Natural Resources and Conservation was investigating the Reliance facility. The letter did

18

not ask BNSF to remediate contamination. The letter did not tell BNSF that DEQ was going to remediate contamination. Instead, the letter simply notified BNSF of its potential liability. DEQ sent BNSF a second letter in 2000. The letter asked BNSF to take certain actions, including preparing reports and investigation plans. DEQ ultimately filed a complaint seeking judicial relief in 2004 and received an abatement order five years later in 2009.

¶67 BNSF argues that CECRA provides two alternative courses of action to DEQ: 1) DEQ may seek a judicial abatement order; or 2) DEQ may issue notice and seek a remedy through administrative processes. The letters from 1995 and 2000 form the basis of BNSF's claim that DEQ had initiated the process to obtain an administrative remedy. BNSF maintains that DEQ issued notice through the letters (and thereby invoked CECRA's administrative remediation process) but then sought an abatement order as part of the judicial process.

¶68 In light of BNSF's arguments concerning election of remedies, the District Court gave BNSF the option to either 1) abate the imminent and substantial endangerment to the public health, welfare, and safety and the environment (the judicial remedy), or 2) allow DEQ to conduct its own remediation and abatement, "the entire cost of which shall be reimbursed by BNSF to DEQ" (the administrative remedy).

¶69 We note that on the one hand, BNSF has consistently maintained on appeal that it is "ready, willing[,] and able" to abate the contamination. On the other hand, BNSF argues on appeal that the District Court was in no position to compel BNSF to abate the contamination. These arguments seem to us to be an attempt to obfuscate the fact that BNSF is ultimately liable for cleanup costs. Because BNSF insists that it is ready, willing, and able to abate the

19

contamination, and because we have affirmed the District Court's order requiring abatement, BNSF can now get started with the cleanup.

¶70 *Whether the District Court abused its discretion when it approved a consent decree entered into by other stakeholders.*

¶71 DEQ entered into a consent decree with one defendant and two non-parties. The settling entities did not assume a percentage of the cleanup costs or pay any amount of money to settle their liability. BNSF argues that the District Court abused its discretion when it approved the consent decree. BNSF raises three arguments in this regard: first, that DEQ failed to disclose the full administrative record on which it relied in making its decision to enter into the consent decree; second, that DEQ failed to comply with § 75-10-719(4), MCA; and third, that it was fundamentally unfair for DEQ to fail to apportion a percentage of the cleanup costs to the settling parties.

¶72 With respect to BNSF's first argument, the District Court determined that DEQ had "used historical information from eighty years of industrial use at the facilities and ha[d] used *all the available information* collected at the facilities over the past twenty years to allocate the liabilities of all responsible parties." (Emphasis added.) The court also noted that it had reviewed the extensive administrative record. BNSF has failed to prove that anything was missing from the administrative record considered by the District Court.

¶73 With respect to BNSF's second argument, the record does not reflect that DEQ failed to comply with § 75-10-719(4), MCA. Section 75-10-719(4), MCA, promotes the use of consent decrees. DEQ is directed to use its *judgment* in entering into consent decrees and to

20

consider, among other factors, "the toxicity of the hazardous or deleterious substances involved and the person's contribution of hazardous or deleterious substances in relation to the total volume of hazardous or deleterious substances at the facility." Section 75-10-719(4), MCA. The record reflects that DEQ elected to settle with these parties and not apportion liability for cleanup costs based on a number of legitimate factors—including the settling parties' lack of financial resources.

¶74 With respect to BNSF's final argument that it was fundamentally unfair for DEQ to fail to apportion a percentage of the cleanup costs to the settling parties, the District Court noted that the settling parties had only one primary remaining asset each: the parcels of real property they owned at the contaminated sites. The court observed that the settling parties had pledged not only all their remaining assets to facilitate remediation of contamination, but also "assurances that they will facilitate the cleanup in whatever manner DEQ requires." Most importantly, the court concluded that "[i]t does not appear that DEQ could have received more from these settling parties." We conclude that, based on the analysis set forth above, BNSF has failed to demonstrate that the District Court abused its discretion in approving the consent decree.

¶75 *Whether the District Court erred by failing to reduce BNSF's liability after other defendants had settled.*

¶76 DEQ entered into several consent decrees with other parties. These consent decrees are separate from the consent decree discussed above. BNSF concedes that CECRA imposes joint and several liability, but BNSF maintains that its liability should be reduced by the

21

settlement amounts. BNSF also argues that the District Court erred because it failed to order that BNSF's liability shall not include any part of the money appropriated by the Montana legislature towards remediation of this contamination. BNSF maintains that without these offsets, DEQ will realize a windfall.

¶77 If the plain language of a statute is clear and unambiguous, no further interpretation is required. *See e.g. Hulstine v. Lennox Indus.*, 2010 MT 180, ¶ 28, 357 Mont. 228, 237 P.3d 1277. Section 75-10-719(1), MCA, provides that "[t]he terms of the settlement *may* reduce the potential liability of the other potentially liable persons by the amount of the settlement." (Emphasis added.) The District Court was not required to reduce BNSF's liability.

¶78 We are at a loss to comprehend BNSF's argument that DEQ will realize a windfall unless BNSF's liability is reduced. First, DEQ has allocated taxpayer dollars over the course of ten years to investigate the contamination and devise a cleanup plan. Second, BNSF's liability will be reduced by the settlements if they are paid. If those parties fail to pay, however, DEQ will be able to recover those amounts from BNSF because BNSF is jointly and severally liable. Lastly, despite BNSF's arguments to the contrary, the District Court's February 10, 2009, Findings of Fact, Conclusions of Law, and Order plainly states that "BNSF's liability hereunder shall not include any part of the $1.25 million appropriated by the Montana legislature towards environmental work at this project." BNSF's arguments with respect to this issue are without merit. The District Court did not err when it declined to reduce BNSF's liability after other defendants had settled.

¶79 Affirmed.

22

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ JIM RICE
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS