DA 07-0165

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 13

SANDRA K. HARRIS,

      Plaintiff and Appellant,

  v.

JOHN V. HANSON, M.D.; ANNE W.
GIULIANO, M.D.; and JOE DILLARD, M.D.,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 05-1134
Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Neel Hammond and Paul M. Warren, Cozzens, Harman, Warren & Harris,
Billings, Montana

      For Appellees:

            Julie A. Lichte, Crowley, Haughey, Hanson, Toole & Dietrich, Bozeman,
Montana (Anne W. Giuliano, M.D., and Joe Dillard, M.D.)

            John J. Russell, Brown Law Firm, Billings, Montana (John V. Hanson,
M.D.)

Submitted on Briefs:  February 27, 2008

Decided:  January 21, 2009

Filed:

_____
                  Clerk

Justice John Warner delivered the Opinion of the Court.

¶1     Sandra K. Harris (Harris) brought suit against John V. Hanson, M.D. (Hanson), Anne W. Giuliano, M.D. (Giuliano), and Joe Dillard, M.D. (Dillard), claiming they were professionally negligent in failing to diagnose her breast cancer from a mammogram performed in February of 2002, a mammogram performed in January of 2004, and an ultrasound performed in March of 2004.  The case was tried before a jury which found the doctors were not negligent.  Judgment was entered for the defendants and Harris appealed.

¶2     The issues raised are:

¶3     Issue 1:  Did the District Court err in denying challenges for cause to jurors M.S. and C.N.?

¶4     Issue 2: Did the District Court err in admitting into evidence portions of the expert testimony of Dr. William Rodgers?

¶5     Issue 3: Did the District Court err in refusing Harris's proposed jury instructions relating to the damage aspect of "loss of chance" and apportionment of damages?

**BACKGROUND**

¶6     Between February 2000 and January 2004, Harris had four mammograms performed in Billings. The mammogram of February of 2002 was read by both Giuliano and Hanson. The process of having two radiologists read a mammogram is known as double reading.  It is a standard practice in the field to increase accuracy.  Hanson and Giuliano did not speak with each other prior to interpreting the February 2002 mammogram.  Both Giuliano and Hanson read the mammogram as negative and without significant new findings since a prior mammogram of November 2000.

2

¶7 Harris's next mammogram was performed and read on January 7, 2004. Dillard compared the January 2004 mammogram to the one taken in February of 2002. At this time he did not speak with Hanson about his findings. Dillard noted an enlarging mass in the upper left outer quadrant of the left breast which measured 1.7 cm. Dillard opined that the mass was "probably benign" but requested prior studies so he could review them for additional comparison. Dillard testified that after reviewing the previously taken mammograms, he felt the mass was probably a lymph node. He assessed the mammograms as incomplete and decided that additional imaging evaluation was needed. Dillard recommended an ultrasound of the left breast.

¶8 On March 9, 2004, Hanson completed the ultrasound recommended by Dillard. Hanson determined the findings from the ultrasound were consistent with a lymph node. Hanson reviewed Dillard's films and reports from January of 2004, but did not discuss his findings from the ultrasound with Dillard.

¶9 In June of 2004 Harris herself discovered an abnormality in her left breast and consulted with her internist, Dr. Fishburn. Dr. Fishburn ordered a diagnostic mammogram, which was interpreted by Hanson in late July of 2004. Hanson interpreted the July 2004 mammogram as showing a change, a palpable abnormality, from the exam done in January of 2004. Due to this abnormality Hanson performed an ultrasound of the left breast and determined the changed region was suspicious for malignancy. He recommended a core needle biopsy, which was performed on August 2, 2004. The results of the biopsy confirmed Harris had a malignancy in her left breast.

¶10 On August 12, 2004, Harris underwent a left breast mastectomy. She also underwent aggressive chemotherapy and radiation therapy after her surgery. At the time of trial she had no current evidence of cancer.

¶11 A jury trial commenced January 29, 2007. During voir dire the following exchange took place between counsel for Harris, Neel Hammond (Hammond), and the potential juror M.S.:

Hammond: . . . Dr. Hanson is represented by John Russell who is a partner with the Brown Law Firm. Anybody familiar with the Brown Law Firm or . . . What's your familiarity with the Brown Law Firm?

M.S.: I work in risk management at the Billings Clinic and John has defended malpractice claims against Deaconess.

Hammond: Have you helped John in his litigation defense with medical malpractice at Deaconess?

M.S.: Yes.

Hammond: Have you ever been involved on a Plaintiff's behalf in medical malpractice cases?

M.S.: No.

Hammond: [M.S.], do you think that experience might affect your judgment sitting as a juror in this case?

M.S.: I would like to think not.
Hammond: So you think you can make a fair and impartial judgment in this case?

M.S.: Yes.

Hammond: Anybody else familiar with the Brown Law Firm or with John Russell? Now, the Plaintiff's attorneys in this case are myself

4

and Paul Warren. Paul Warren is a long-time experienced attorney with Cozzens, Harman, Warren and Harris firm here in Billings. Are any of you personally familiar with Paul or with any of the employees of Cozzens, Harman, Warren and Harris? [M.S.], once again? What has been your involvement with the Cozzens Law Firm?

M.S.: The Cozzens Law Firm has, at time, filed malpractice suits against Billings Clinic.

Hammond: Now, [M.S.], I want to ask you another question, and that is, have you ever been on the same side in your career as the Cozzens Law Firm or any of the members of the Cozzens Law Firm?

M.S.: No.

Hammond: Your Honor, I move to excuse [M.S.] for cause.

At this time counsel for Hanson, John Russell (Russell), asked to voir dire the potential juror

and the following exchange occurred:

Russell: [M.S.], do you have opportunities to review cases where patients complain to you that their care was, they had a problem with their care by a doctor at the Billings Clinic?

M.S.: Yes, that's my job.

Russell: And have you had cases where you've investigated that, talked to the physician, and decided yeah, there is a basis for a complaint here, and you've agreed with the patient?

M.S.: Absolutely.

Russell: So you have seen both sides of the malpractice situation in your job, is that fair to say?

M.S.: Correct.

Russell: And despite the fact that you know me and we've worked

5

together, do you think you can set that aside, listen to the evidence, before you make up your mind, be fair and impartial, and decide the case based on the evidence, setting aside whatever you know about me or don't know about me?

M.S.:       Yes, I do.

Russell:    I'd object to the challenge for cause.

Hammond then asked:

Hammond:    [M.S.], you have assisted patients with money claims. Have you ever assisted patients when they took their civil rights to sue on their behalf into a courtroom?

M.S.:       No.

Hammond:    Have you ever advised them to seek Plaintiff's counsel?

M.S.:       Yes, occasionally I have.

Hammond:    And did you testify for them when they went to court?

M.S.:       No.

Hammond:    Your Honor, I renew my motion to excuse this juror for cause.

The judge denied the renewed motion, because M.S. said she thought she could be fair and look at the facts of this case independently. M.S. was later removed by Harris using a peremptory challenge.

¶12    Later during voir dire by Julie Lichte (Lichte), counsel for Dillard and Giuliano, the following exchange occurred:

C.N.:       I think our firm has legal work done by Crowley, the firm that I work for. [Lichte is associated with the Crowley law firm.]

Lichte:     Yeah, and you're [C.N.]?

C.N.: Mm-hmm.

Lichte: What type of work, or what's the relationship?

C.N.: It's a consulting engineering firm and they do contract work.

Lichte: Do you come into contact with lawyers at the Crowley Law Firm as part of your responsibilities?

C.N.: No.

Lichte: And the law firm acts as a consultant on legal affairs for your company, is that right?

C.N.: Yeah.

Lichte: And you're a civil engineer?

C.N.: Correct.

Lichte: Do you know any of the attorneys at the Crowley Firm personally?

C.N.: Um, Len Smith, and uh, Neil who I think is in your Bozeman office.

Lichte: Neil Westesen? Okay. How do you know Len and Neil?

C.N.: Len's a friend from school and Neil I met through their basketball team, which I play.

Lichte: Oh, okay. Is there anything about your business relationship with the Crowley Law Firm or the fact that you know Len Smith or Neil Westesen that you think might influence or impact your ability to make decisions in this case?

C.N.: No.

¶13    After voir dire was completed the parties convened in chambers and Hammond made a motion to excuse C.N. for cause.  The court denied the motion.  Hammond did not use a peremptory challenge to strike C.N. and he served as a juror.

¶14    During the trial, Giuliano and Dillard called Dr. William Rodgers (Rodgers) as a witness during their case in chief.  Rodgers has a Ph.D. in cell biology and embryology, completed medical school and completed both a residency in anatomic and clinical pathology and a cancer research fellowship.  Over Harris's objection, Rodgers testified that Harris's particular cancer would be invisible on x-ray and that it had been present for ten years prior to July of 2004.

¶15    The parties submitted proposed jury instructions.  Harris offered a damage instruction considering "loss of chance."  Defense counsel objected to this instruction and the court refused it.  Harris objected to Giuliano and Dillard's proposed jury instruction 23 concerning the apportionment of damages, which the District Court accepted as its Instruction 20.  The District Court rejected Harris's proposed instruction on the same subject.

¶16    The jury reached a defense verdict, finding none of the three doctors were negligent.

**STANDARDS OF REVIEW**

¶17    This Court reviews a district court's refusal to grant a challenge for cause for abuse of discretion.  *Reff-Conlin's, Inc. v. Fireman's Fund Insurance Company*, 2002 MT 60, ¶ 16, 309 Mont. 142, ¶ 16, 45 P.3d 863, ¶ 16.

¶18    Issues concerning the admissibility of evidence are within the discretion of the district court.  Given a district court's broad discretion to determine whether evidence is relevant and

admissible, this Court will not overturn such a determination absent a showing of abuse of discretion. *State v. Larson*, 2004 MT 345, ¶ 29, 324 Mont. 310, ¶ 29, 103 P.3d 524, ¶ 29. The determination of the qualification of an expert witness is a matter largely within the discretion of the trial judge and, in the absence of a showing of abuse, ordinarily will not be disturbed." *Hart-Albin Co. v. McLees, Inc.* 264 Mont. 1, 10, 870 P.2d 51, 56 (1994).

¶19 This Court will not reverse a district court's choice of instructions absent an abuse of discretion. *Murphy Home, Inc. v. Muller*, 2007 MT 140, ¶ 74, 337 Mont. 411, ¶ 74, 162 P.3d 106, ¶ 74. We consider instructions in their entirety and in connection with both the other instructions given and the evidence introduced at trial. *Murphy Homes*, ¶ 74. The party claiming error must show prejudice, which cannot be shown if the instructions state the applicable law. *Murphy Homes*, ¶ 74.

**DISCUSSION**

¶20 *Issue 1: Did the District Court err in denying challenges for cause to jurors M.S. and C.N.?*

¶21 Section 25-7-223, MCA, provides:

Challenges for cause may be taken on one or more of the following grounds:

. . .

(3) standing in the relation of guardian and ward, debtor and creditor, employer and employee, or principal and agent to either party or being a partner in a business with either party or surety on any bond or obligation. . . .

9

;

(5) interest on the part of the juror in the event of the action or in the main question involved in the action, except his interest as a member or citizen of a municipal corporation;

.    .    .

(7) the existence of a state of mind in the juror evincing enmity against or bias in favor of either party.

¶22    A court abuses its discretion if it fails to excuse a prospective juror whose actual bias is discovered during voir dire. *State v. Heath*, 2004 MT 58, ¶ 7, 320 Mont. 211, ¶ 7, 89 P.3d 947, ¶ 7.   In *Reff-Conlin's*, a prospective juror disclosed during voir dire that he was the president of U.S. Bank, and the bank was represented at that time by plaintiff's counsel. The prospective juror also disclosed that in his capacity as president of the bank, he worked with the attorneys. *Reff-Conlin's,* ¶ 12.  After noting that § 25-7-223, MCA, does not specifically address the attorney-client relationship, the Court concluded that since the bank president was one of the people responsible for selecting attorneys to represent the bank, and the bank had an ongoing relationship with the plaintiff's attorneys, there was a strong suggestion the prospective juror had a favorable opinion of the attorneys' work. *Reff-Conlin's,* ¶ 24.  This presented the strong possibility of bias in favor of the party represented by that lawyer. *Reff-Conlin's,* ¶ 26.  The Court therefore concluded the district court abused its discretion when it did not grant a challenge for cause under § 25-7-223(7), MCA. *Reff-Conlin's,* ¶ 27.

¶23    In *Williams v. Rigler*, 234 Mont. 161, 761 P.2d 833 (1988), the Court concluded the district court did not abuse its discretion in refusing a challenge to two prospective jurors who considered defense counsel to be their attorney because no present business was

10

pending between defense counsel and the prospective jurors, and one said that her past relationship with counsel would not reflect on her ability to act as a juror. The Court held that in the absence of specific statutory authority rendering a prospective juror who was a client of defense counsel incompetent, we will defer to the discretion of the District Court, whose judgment will not be set aside unless a clear abuse of discretion is shown. *Williams*, 234 Mont. at 164, 761 P.2d at 834-35.

¶24 *(a) Prospective Juror M.S.*

¶25 Although a different member of defense counsel's law firm had in the past represented members of the clinic where M.S. was employed, the record does not show that M.S.'s employer was represented by defense counsel at the time of this trial. In *Reff-Conlin's*, the prospective juror was the president in charge of the client bank and made, or at least participated in, hiring decisions when it came to retaining lawyers. In this case, M.S. only worked at the Billings Clinic, who was at times the client of defense counsel's law firm. The record does not show that M.S. had any input into which attorneys would be retained to represent her employer. M.S. stated she "helped" defense counsel. No details concerning what this help consisted of appear in the record. When asked if her knowledge of defense counsel might affect her judgment if she were to sit on the jury, M.S. stated, "I would like to think not." M.S. also twice stated she could be fair and impartial. Not only did M.S. say she could make a fair and impartial judgment, she also said there had been times when, after reviewing patient claims, she agreed there was a basis for a complaint, and that there had been occasions when she suggested a patient seek counsel.

11

¶26    There is no record that M.S. was ever personally represented by defense counsel or his law firm. There is no record that M.S. was, on behalf of her employer, presently working on litigation with defense counsel or his law firm.  The record reveals no actual bias of M.S. We will defer to the discretion of the District Court unless an abuse of discretion is shown. *Williams*, 234 Mont. at 164, 761 P.2d at 834.

¶27    *(b)  Prospective Juror C.N.*

¶28    During voir dire, prospective juror C.N. stated he thought the engineering firm he worked for had legal work done by "Crowley," (Lichte's firm).  However, he had not had contact with any attorneys as an employee of the engineering firm.   There is no record that the engineering firm was currently represented by a lawyer from the Crowley law firm. There is also no record that C.N. had any role to play in which lawyers had been, or would ever be, retained by the firm.

¶29    The only contact C.N. had with lawyers in the Crowley law firm were as a school acquaintance of one lawyer, and with another as a basketball opponent.  C.N. stated that his knowledge of these lawyers would not cause him to be partial to one party or the other in the lawsuit.  The record shows nothing that indicates C.N. had a bias.  There is no relationship shown in the record which would require the District Court to grant a challenge to C.N. under § 25-7-223, MCA.

¶30    Based on the record, we conclude that the District Court did not abuse its discretion in denying Harris's challenges for cause to prospective jurors M.S. and C.N.

12

¶31    *Issue 2: Did the District Court err in admitting into evidence portions of the expert testimony of Dr. William Rodgers?*

¶32    M. R. Evid. 702 provides if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise.  It is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation.  *State v. Damon*, 2005 MT 218, ¶ 17, 328 Mont. 276, ¶ 17, 119 P.3d 1194, ¶ 17 (internal quotations omitted).

¶33    We held the district court's gatekeeper role in applying the *Daubert* factors, which guide trial courts in their assessment of the reliability of proffered scientific expert testimony, applies only to the admission of novel scientific evidence in Montana.  *Damon*, ¶ 18.  Novelty in Montana is assessed from a very narrow perspective.  *Damon*, ¶ 18.

¶34    William H. Rodgers, M.D., is a pathologist from the University of Maryland who testified as an expert for the defendants.  Rodgers' background includes both a Ph.D. in cell biology and embryology and an M.D.  He performed extensive research programs in breast cancer fields and taught at Vanderbilt University.  Rodgers held the position of Director of Anatomic Pathology at both Oregon Health and Sciences University and University of Maryland.  Rodgers' involvement in breast cancer research included twenty years in the study of stromoepithelial interactions, which is the basic biology of breast cancer and other cancers involving how the cancer cells interact with normal tissue elements in the breast to

13

allow tumors to form, and clinical research in cyto-pathology which has to do with the interpretation of breast biopsies and the interaction of radiology and pathology in mammography. Rodgers was not board certified in radiology, but he regularly viewed mammograms with radiologists as part of his practice of cyto-pathology.

¶35 Over Harris's objection that he was not a radiologist, Rodgers testified that it was his opinion Harris's particular cancer would be invisible on x-ray and that it had been present for ten years prior to July of 2004. Harris argues that since Rodgers only examined a miniscule sampling of Harris's cancerous tissue at a single instant in time, did not use the mammographically measured size of the mass determined to be a lymph node from 2002-2004, nor the ultrasound measurements of March and August 2004, and considering that her cancer was infiltrating ductal cancer which is more easily detectable mammographically than lobular cancer, and because his opinions were prepared for use in litigation, Rodgers' conclusions about the visibility and growth rate of Harris's cancer constitutes novel scientific theories which are actually junk science. Harris goes on to argue that Rodgers' opinion was overreaching, mislead the jury and constituted expert opinion without a legitimate scientific foundation, which was admitted into evidence contrary to M. R. Evid. 702.

¶36 In Montana, an expert's reliability is tested in three ways under Rule 702, M. R. Evid.: (1) whether the expert field is reliable, (2) whether the expert is qualified, and (3) whether the qualified expert reliably applied the reliable field to the facts. First, the district court determines whether the expert field is reliable. The district court then determines whether the witness is qualified as an expert in that reliable field. If the court deems the

14

expert qualified, the testimony based on the results of his examination of the facts is admissible--shaky as that evidence may be. The question whether a qualified expert reliably applied the principles of that reliable field to the facts of the case is for the finder of fact allowing vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. *State v. Clifford,* 2005 MT 219, ¶ 28, 328 Mont. 300, ¶ 28, 121 P.3d 489, ¶ 28 (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 596, 113 S. Ct. 2786, 2798 (1993)).

¶37     Dr. Rodgers is a pathologist. Pathology is a recognized field of scientific study. He is admittedly well qualified in that field. Specifically, the record reveals that Rodgers has a significant amount of knowledge and experience in the study of breast cancer, including how it develops, how it is detected and how it is treated. He also has significant experience in the use of mammography. The expert field, pathology, is established as reliable, and Rodgers is qualified in that field. Whether Rodgers gathered and examined sufficient facts, and correctly applied the facts to reach his opinions, was a question for the jury to decide after cross-examination, presentation of contrary evidence, and application of the law. We conclude that the District Court did not abuse its discretion in allowing the opinions of Rodgers to be presented to the jury for its consideration.

¶38     *Issue 3: Did the District Court err in refusing Harris's proposed jury instructions relating to the damage aspect of "loss of chance" and to apportionment of damages?*

¶39     Harris argues on appeal that the District Court erred in instructing the jury in two areas: damages that may be assessed because the negligence of defendants was a contributing

15

cause of surviving for a shorter period of time or having a recovery of a lesser extent or quality; and the apportionment of any damages between the defendants. The issues of negligence and damages were submitted to the jury using a special verdict form. The special verdict required that the jury answer questions related to damages only if it first answered predicate questions concerning whether a defendant was negligent in the affirmative. The jury answered the predicate questions concerning negligence in the negative. Thus, the instructions Harris complains of were not considered by the jury.

¶40    When a special verdict requires a jury to answer a question only if it first determines that a predicate question is answered in the affirmative, and the jury answers the predicate question in the negative, we have consistently held that the party objecting to the submission of the second, unanswered question is not prejudiced. Under such circumstances we consider any error harmless, and decline to interfere with the jury's decision. See e.g. *Upky v. Marshall Mountain, LLC*, 2008 MT 90, ¶ 19, 342 Mont. 273, ¶ 19, 180 P.3d 651, ¶ 19 (concluding there was no prejudice to plaintiff by submitting the question of his contributory negligence to the jury as the jury found the defendant was not negligent); *Payne v. Knutson*, 2004 MT 271, ¶¶ 17-18, 323 Mont. 165, ¶¶ 17-18, 99 P.3d 200, ¶¶ 17-18 (concluding there was no prejudice to the plaintiff where the jury was not instructed to apportion negligence among the defendants because the jury found the plaintiff was more than 50% negligent and thus could not recover); *Peschke v. Carroll College*, 280 Mont. 331, 343, 929 P.2d 874, 881 (1996) (concluding that although a district court erred in admitting a videotape, it went to the issue of causation, which the jury did not reach, and the error was thus harmless); *Drilcon,*

16

*Inc. v. Roil Energy Corp.*, 230 Mont. 166, 173, 749 P.2d 1058, 1062 (1988) (declining to address appellant's argument that the special verdict form erroneously included non-parties because the jury apportioned negligence only among the parties to the action and appellant was not prejudiced). In this case, as the jury did not reach the issue of damages no reversible error can be predicated on damage instructions. *Stenberg v. Neel*, 188 Mont. 333, 339, 613 P.2d 1007, 1011 (1980).

¶41 Citing *Thomsen v. State By and Through Dept. of Highways*, 253 Mont. 460, 833 P.2d 1076 (1992), Harris argues that even though the jury did not consider the question of damages, the submission of the damage instructions she claims were erroneous could have had an effect on the jury's verdict on the issue of liability, and thus she is entitled to a new trial.

¶42 In *Thomsen*, the Court determined that the district court, contrary to a previously granted motion *in limine*, erroneously admitted evidence that the plaintiff may have been paid by a collateral source or that insurance coverage was available. The Court held that under these circumstances the erroneously admitted evidence could have affected the liability verdict. *Thomsen*, 253 Mont. at 463, 833 P.2d at 1078. In this case, the District Court did not erroneously admit evidence that Harris may be reimbursed from a collateral source or that insurance was available, which may have been considered by the jury. Here, the jury was clearly instructed that it was first to consider whether any of the defendants were professionally negligent, and only if they found negligence were they to consider damages.

17

We conclude that even if the damage instructions were erroneous as Harris claims, such error would be harmless.

¶43　　Affirmed.

/S/ JOHN WARNER

We Concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ BRIAN MORRIS

Justice James C. Nelson concurs.

¶44　　I concur in the Court's Opinion. I write separately only to note that, with respect to our reference to *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 113 S. Ct. 2786 (1993), cited at ¶ 36 of the Court's Opinion, I continue to disagree in our limiting the application of *Daubert* to "novel scientific evidence." *See State v. Clifford*, 2005 MT 219, ¶¶ 60-91, 328 Mont. 300, ¶¶ 60-91, 121 P.3d 489, ¶¶ 60-91 (Nelson, J., concurring). I agree that the trial court and this Court have applied our narrowed version of *Daubert* correctly in the case at bar. That said, if our application of *Daubert* was not narrowed to "novel scientific evidence," the trial judge may well have been persuaded to conduct a *Daubert* hearing with

respect to the matter of Dr. Rodgers' retrograde extrapolation of the size, visibility and growth rate of Harris's tumor, from his study of tissue samples.

¶45 Without attempting to predict how the question may be resolved, it can be said with some certainty that unless counsel in some case specifically challenges in the trial court and then in this Court our jurisprudence narrowing *Daubert,* the courts will simply continue to apply that case only to "novel scientific evidence." I, at least, suggest that we have improperly narrowed the application of *Daubert*. In my view, the trial courts should serve a greater gatekeeper function than we presently allow.

¶46 I concur.

/S/ JAMES C. NELSON


Justice Patricia O. Cotter joins the Concurrence of Justice James C. Nelson


/S/ PATRICIA COTTER