FILED

10/04/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0516

DA 21-0516

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 191

THERMAL DESIGN, INC., a Nebraska Corporation,

> Plaintiff, Counterclaim Defendant,
> and Appellee,

STEVE THORSON, an individual, d/b/a TNT Building
Systems, a general partnership; TRAVIS THORSON,
an individual, d/b/a TNT Building Systems, a
general partnership;

> Defendants, Crossclaim Defendants,
> and Appellees,

STEEL CONCEPTS, LLC, an Idaho limited liability
company; and STEVE LARSON, an individual,

> Defendants and Appellees,

> v.

MARK and PAM DUFFY, a married couple,

> Counterclaim Plaintiffs, Crossclaim
> Plaintiffs, and Appellants,

MARK DUFFY, an individual; PAM DUFFY, an individual;
and CENTRAL COPTERS, INC., a Montana corporation,

> Defendants and Appellants.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV-15-403-A
Honorable Peter B. Ohman, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Kellie G. Sironi, Attorney at Law, Billings, Montana

For Appellee Thermal Design, Inc.:

Michael P. Manning, Ritchie Manning Kautz PLLP, Billings, Montana

For Appellees Steven Thorson and Travis Thorson:

Steve Thorson, Self-Represented, Manhattan, Montana

Travis Thorson, Self-Represented, Belgrade, Montana

Submitted on Briefs: July 13, 2022

Decided: October 4, 2022

Filed:

_____
Clerk

2

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Defendants Mark and Pam Duffy and Central Copters, Inc. (Central Copters) appeal the October 4, 2021 Judgment, Decree of Foreclosure, and Order of Sale by the Eighteenth Judicial District Court, Gallatin County, as well as all orders and actions contained therein. We restate and address the following issues:

1. *Whether the District Court abused its discretion during voir dire.*

2. *Whether the District Court erred by ruling that Thermal Design's construction lien was valid against Central Copters, as the contracting party to a real estate improvement contract with TNT, and the Duffys, as landowners.*

3. *Whether the District Court erred by allowing TNT to make a crossclaim against Central Copters that was not included in the pretrial order.*

¶2 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Mark and Pam Duffy own two parcels of real property near the Bozeman Yellowstone International Airport in Belgrade that they lease to Central Copters, a charter helicopter and precision lifting company owned and operated by the Duffys.

¶4 In the fall of 2013, Mark ordered a pre-engineered steel building from R & M Steel, a company based in Idaho. The building was to serve as a hangar and repair facility for Central Copters. In the spring of 2014, Central Copters hired Steve Thorson and his son, Travis, d/b/a TNT Building Systems (TNT), to assemble the building. TNT met with Mark at the Central Copters facility in Belgrade to discuss the details of the job. Because Mark was concerned about the building's insulation, the group visited three of TNT's completed projects nearby, each with a different type of insulation, including one called the "Simple

3

Saver System," designed and supplied by Thermal Design, Inc. Steve testified at trial that, to his recollection, Mark was "focused on the Simple Saver one because it's the best looking. It's the most energy efficient. It's the best of those three products." Steve testified:

> When we left that meeting, he was definitely interested in it. The only other insulation that he ever mentioned to me -- I mean, he said he didn't want what was in his current hanger [sic], which was clear, and then he said he looked into doing spray foam in the new building. However, he thought that was going to be too expensive, and so I told him about the Simple Saver System, which is a -- like I said -- very good looking, highly efficient system, and so I told him, at that point, that I would get him literature, and that he could look at it then, so that's what we did.

¶5 On June 6, 2014, Steve sent an e-mail to Mark, bidding a flat fee of $70,000 to erect the pre-engineered building kit, specifying that "[t]his quote includes installing the [sic] all the doors." The e-mail noted that Steve had been "talking to several subs to get the ball rolling," and explained that TNT would mark up any subcontractor invoices by ten percent as a general contractor fee. While neither party signed the bid, Mark testified at trial that the parties had an agreement encapsulated by the June 6 e-mail. The e-mail did not specify a completion date or specifically reference any costs associated with TNT providing or installing insulation for the building.

¶6 Over the summer, Mark and Central Copters prepared the job site. When Mark was having trouble finding a contractor to pour the concrete foundation on schedule, he gave TNT permission to engage C&H Engineering and Surveying, Inc. to re-engineer the slab and hire Kruse Enterprises to pour the foundation. Central Copters paid TNT's related

4

invoices within days, including a ten percent general contractor markup on both invoices, without dispute.

¶7 On August 15, 2014, Mark sent Steve an e-mail updating him on the progress at the job site and asking Steve to "please confirm that you have ordered the insulation for the building from the source you have." Steve testified that "because [the Simple Saver System] was the only insulation that [TNT] offered," he understood the e-mail to request that he purchase the Simple Saver System from Thermal Design. However, Steve waited until the building had progressed to a certain point in early October to provide Thermal Design with the final building plans and actually place the order. Thermal Design's engineering department then used the building plans to design an insulation system specific to the Central Copters hangar. Based on Thermal Design's specifications, another company, Johns Manville, manufactured and shipped the fiberglass insulation directly to the job site from its plant. The Simple Saver System insulation kit shipped in three parts in late October, arriving in Belgrade by early November 2014. Mark testified that when the pallets arrived at the site he had "never heard of Thermal Design," TNT had never provided him a quote for the product, and he never authorized TNT to purchase the insulation kit.

¶8 The pre-engineered building was shipped to the site in late August and TNT unloaded eight flatbed trailer loads over two days. Kruse Enterprises completed the concrete foundation in mid-September. By mid-October, Steve testified that the building was about 40 percent complete, and TNT submitted an invoice to Central Copters for $62,520. The invoice included a $25,000 charge labeled "1st labor deposit," which was

about 35 percent of TNT's $70,000 bid, and a $37,520 charge for "[i]nsulation materials[:] Simple Saver System."[1]  Mark testified that, with winter approaching, he was disappointed with the progress on the building and "was not prepared to pay TNT for something he had not done."  Mark and Steve met on November 13, 2014.  The meeting deteriorated into a shouting match.  Mark wrote Steve an e-mail later that day, which stated, "I fully intend to pay you in a timely manner, but I need you to '**outline the scope of the project with dates describing progress and completion of the project.**'"  (Emphasis in original.)  Steve never responded to Mark's e-mail, nor did TNT provide Mark with a progress report, but TNT began removing its equipment from the building site within the week.  On November 20, 2014, Mark wrote to Steve again, stating, "Consider this email as notice that you are finished with this building project.  You and your 'company' T&T [sic] Building Systems have failed to progress and erect the building and therefore you are 'Terminated.'"

¶9      On December 12, 2014, Mark called Thermal Design to tell them that TNT had walked away from the job and he was having trouble finding a reasonably priced installer. Thermal Design's regional sales manager, Micah James, e-mailed TNT, stating: "Brian [Geary] from Central Copters want[s] to pay us directly for the insulation.  I want to make sure it is OK with you for us to submit the bill to them.  Please contact me today so we can visit about this."  James then e-mailed Geary asking for photos of the progress on the job site and sent him the name of an erector finishing a job in Great Falls who "should be able

---

[1] This amount included a 20 percent markup of Thermal Design's $31,266.12 invoice to TNT.  The jury verdict and the District Court's judgment awarded Thermal Design its invoice amount with no markup and the Duffys and Central Copters have not separately challenged the damages amount.

6

to help you out." On December 15, 2014, Geary sent an e-mail to James indicating that due to higher-than-expected installation costs, "this insulation has become a real problem." Geary asked James to let him know "when to expect trucks" to pick up the insulation and wrote, "This insulation was TNT's Deal and they have Decided to walk off the job and is still there [sic] deal." Central Copters hired Steel Concepts, LLC (Steel Concepts) to complete the building and install spray urethane insulation for $79,025. Neither TNT nor Central Copter ever paid Thermal Design for the Simple Saver System.

¶10 On January 5, 2015, Thermal Design filed a construction lien with the Gallatin County Clerk and Recorder. In May 2015, Thermal Design filed a complaint to foreclose its construction lien against the Duffys and Central Copters. The complaint also asserted claims against Steve and Travis Thorson and TNT, as well as Steel Concepts and its owner, Steve Larson. Central Copters filed an answer denying liability. The Duffys filed counterclaims against Thermal Design for declaratory judgment, breach of warranty and trespass, as well as crossclaims against TNT for breach of contract, negligence, and indemnity. When TNT failed to respond, the clerk entered default against them. In the answer brief that was attached to TNT's motion to set aside the entry of default, TNT denied liability and asserted a crossclaim against the Duffys for breach of contract, claiming the Duffys owed them $25,000 for labor and $31,266.12 for the insulation owed to Thermal Design. In March 2017, Thermal Design moved to voluntarily dismiss Defendants Steel Concepts and Larson.

¶11 The parties proceeded to trial in March 2020. During voir dire, a prospective juror, Claire Daines, disclosed that he was a client of Rick Landers, a partner at Axilon Law, the

7

firm where Mark Evans, Thermal Design's counsel, also worked. Counsel for the Duffys and Central Copters, Kellie Sironi, clarified the relationship between Evans and the potential juror with the following exchange:

MS. SIRONI:   And you know his law partner?

MR. DAINES:   I do. Rick Landers is my principal attorney.

MS. SIRONI:   Okay. Mr. Evans' partner is your attorney at the moment?

MR. DAINES:   Yes. Yes, he is.

MS. SIRONI:   Do you feel like that relationship would possibly influence the way that you see the evidence and hear the evidence?

MR. DAINES:   I don't think so.

MS. SIRONI:   Your Honor, I would like to move to strike this juror for cause because of the relationship with the Plaintiff's law firm.

THE COURT:   Mr. Evans, are you still with Axilon?

MR. EVANS:   I'm working as, like, a contracted lawyer on this one case, and then I'm gone. So I'm affiliated, yes, but I'm no longer a partner. I resigned back in September.

MS. SIRONI:   Nothing personal, I just feel that the relationship is a little too close for my comfort, Your Honor.

THE COURT:   Your comfort doesn't count, Ms. Sironi. Sorry.

MS. SIRONI:   That is true, but I'm making a –

THE COURT:   It needs to fall under one of the statutory exceptions. So maybe follow up with a few more questions with Mr. Daines because he's indicated, at this point, that he doesn't have any concerns.

¶12 Sironi followed up with three additional questions. First, she asked Daines how his experience with his lawyer would affect his ability to hear the evidence in this case, to which Daines responded that he did not think it would have any effect. Second, she asked Daines whether he felt like he could put his feelings for his attorney aside in hearing the evidence, to which Daines responded:

> I don't know why my current attorney matters. . . . . [I]f it was my current attorney, I would probably favor him very definitely because I have great respect for him. Mark, I have respect, but there's no, you know, whatever. I have never really engaged with him in a legal way.

Third, Sironi asked whether Daines felt uncomfortable judging the issues in this case, to which he replied, "No." Sironi then moved, for a second time, to strike the juror for cause. The District Court initially reserved judgment but later denied the motion.

¶13 Also during voir dire, Sironi asked whether any prospective jurors knew the judge. Two jurors responded in the affirmative. Prospective juror Chere LeClair indicated that the judge was her stepmother and Daines stated, "I've just known [the judge] for a long time." The District Court responded, "Almost 150 years. [Counsel], knowing the Judge has no factor or impact on this case, so you can move on with that question." Sironi moved on without objection.

¶14 As relevant to this appeal, Sironi exercised peremptory challenges for prospective jurors Daines and LeClair in the following exchange with the District Court:

THE COURT: Ms. Sironi.

MS. SIRONI: Clair Daines, No. 14.

THE COURT: He's going to be disappointed, you know.

9

MS. SIRONI:    It's probably not much of a surprise that I'm striking him.

THE COURT:    He's going to be disappointed, however.

.   .   .

THE COURT:    Ms. Sironi.

MS. SIRONI:    Chere LeClair.

THE COURT:    Ms. LeClair is No. 23. She'll be disappointed, too. I was surprised at the number of architects overall.

MS. SIRONI:    A lot of contractors.

THE COURT:    Not so surprising in this market.

¶15    At the close of Thermal Design's case, the Duffys and Central Copters filed a motion for judgment as a matter of law, arguing that Thermal Design could not prove the existence of a real estate improvement contract related to the insulation. The District Court denied the motion, orally ruling that there was no dispute Central Copters hired TNT to erect the building, and while questions of fact remained as to the scope of that contract, the contract between Central Copters and TNT for construction of the building was a real estate improvement contract, as a matter of law, and TNT purchased the insulation from Thermal Design pursuant to that real estate improvement contract. The District Court also ruled, as a matter of law, that because Mark was aware of and agreed to the improvement on the real estate before construction began, pursuant to § 71-3-525(3), MCA, Thermal Design's construction lien would apply to both Central Copters, as the contracting party, and the Duffys, as owners and lessors of the real property.

10

¶16 The jury found that Thermal Design's insulation system was specifically fabricated for installation in Central Copters' building and not readily resaleable in the ordinary course of Thermal Design's business. The jury found that TNT, acting as an agent of Central Copters, entered into a contract with Thermal Design for the insulation system, and both TNT and Central Copters were jointly and severally liable for $31,266.12 in damages for breaching the contract with Thermal Design. As to the crossclaim between TNT and Central Copters, the jury found that both parties breached their agreement to erect the building on the Duffys' property but determined that only TNT incurred damages, totaling $23,753.88, resulting from Central Copters' breach.

¶17 Following a series of posttrial motions, in June 2020, the District Court issued a detailed order regarding the foreclosure of Thermal Design's construction lien, restating that, as a matter of law, the contract between Central Copters and TNT for erecting the building was a real estate improvement contract under which Thermal Design furnished the insulation, and therefore Thermal Design had a valid construction lien attaching to both the Duffys' real property and Central Copters' building, which should be foreclosed.

¶18 On October 4, 2021, the District Court entered its judgment, decree of foreclosure and order of sale. The judgment awarded Thermal Design: (1) $31,266.12 jointly and severally against the Duffys, Central Copters, and TNT; (2) $29,899.38 in prejudgment interest through March 13, 2020, against Central Copters and TNT, which continues to accrue at $15.42 per day; (3) $5,050.20 in costs; (4) $32,449.30 in consequential damages against TNT; (5) $16,298.59 in attorney fees against TNT; (6) $125,003.16 in attorney fees against the Duffys and Central Copters; (7) postjudgment interest; and (8) foreclosure of

11

its construction lien. The judgment also awarded TNT $23,753.88 against Central Copters, as well as postjudgment interest.

## STANDARDS OF REVIEW

¶19 We review a district court's refusal to grant a challenge for cause and discretionary trial court rulings, like a court's control of voir dire, for abuse of discretion. *Harris v. Hanson*, 2009 MT 13, ¶ 17, 349 Mont. 29, 201 P.3d 151; *State v. Grant*, 2011 MT 81, ¶ 8, 360 Mont. 127, 252 P.3d 193; *Public Lands Access Ass'n v. Jones*, 2004 MT 394, ¶ 17, 325 Mont. 236, 104 P.3d 496.

¶20 A district court's decision to grant or deny judgment as a matter of law is reviewed de novo. *Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 18, 336 Mont. 105, 152 P.3d 727. "Judgment as a matter of law is properly granted only when there is a complete absence of any evidence that would justify submitting an issue to a jury." *Martin v. BNSF Ry. Co.*, 2015 MT 167, ¶ 8, 379 Mont. 423, 352 P.3d 598.

¶21 This Court reviews a jury's verdict de novo to "determine whether substantial evidence—more than a scintilla but perhaps less than a preponderance—supported the jury's verdict." *Stubblefield v. Town of West Yellowstone*, 2013 MT 78, ¶ 19, 369 Mont. 322, 298 P.3d 419 (internal quotation and citation omitted). We review the facts in the light most favorable to the prevailing party and will not disturb the jury's findings regarding the weight and credibility of conflicting evidence "unless they are inherently impossible to believe." *Wise v. Ford Motor Co.*, 284 Mont. 336, 339, 943 P.2d 1310, 1312 (1997).

**DISCUSSION**

*1. Whether the District Court abused its discretion during voir dire.*

¶22    First, the Duffys and Central Copters argue the District Court erred when it denied their challenge for cause of prospective juror Daines because Daines considered Thermal Design's trial attorney's former law partner, Landers, to be his "principal attorney," and it was disclosed posttrial that Landers had billed time to the case but had not appeared as counsel of record.  The Duffys and Central Copters contend that forcing them to use a peremptory challenge to exclude Daines from the jury panel denied them an equal number of peremptory challenges and entitles them to a new trial.  Thermal Design argues the District Court did not abuse its discretion because the Duffys and Central Copters failed to establish that Daines had present business pending with Landers, despite the District Court providing them with ample opportunity to develop the record.

¶23    "A court abuses its discretion if it fails to excuse a prospective juror whose actual bias is discovered during voir dire." *Harris*, ¶ 22 (citing *State v. Heath*, 2004 MT 58, ¶ 7, 320 Mont. 211, 89 P.3d 947).  We generally adhere to "the rule that the trial court is in a better position to judge the prejudice of jurors, and that its decision will not be set aside unless the error is manifest or there is a clear abuse of discretion, even when there has been a forced use of a peremptory challenge." *Mahan v. Farmers Union Cent. Exch.*, 235 Mont. 410, 417, 768 P.2d 850, 855 (1989) (internal citations omitted).

¶24    Montana's statute providing the grounds to challenge jurors for cause in civil actions "does not expressly address past or present business relations between a juror and an attorney involved in the case." *Williams v. Rigler*, 234 Mont. 161, 163-64, 761 P.2d 833,

13

834 (1988) (citing § 25-7-223, MCA). This Court has held that "[a]n ongoing attorney-client relationship between a prospective juror and trial counsel presents the strong possibility of bias in favor of the party represented by those attorneys." *Reff-Conlin's Inc. v. Fireman's Funds Ins. Co.*, 2002 MT 60, ¶ 26, 309 Mont. 142, 45 P.3d 863. Conversely, we declined to find an abuse of discretion when a trial court denied a challenge for cause after two jurors "considered defense counsel to be their attorney [but] neither had any business pending with [the attorney] at the time of trial," and after "one of the jurors answered that her past relationship would not affect her ability to act as a juror." *Williams*, 234 Mont. at 164, 761 P.2d at 835.

¶25 Although Daines, the challenged juror, testified that Landers was his "principal" and "current" attorney, the record does not establish that Daines had any present business with Landers such that the attorney-client relationship would affect his ability to act as an impartial juror in this case. Voir dire evinced no indication of Daines' actual or implicit bias related to Evans. While Daines testified that he would "very definitely" favor his current attorney because he had great respect for him, he stated, "I don't think [my experience with my attorney] would have any effect on [my hearing the evidence in this case]. I know [Thermal Design's attorney]. I know a lot of people. He's a decent guy, but . . . . I have never been engaged with him in a legal way." Without evidence the juror had an ongoing attorney-client relationship with Thermal Design's trial counsel, or more than a bare allegation of partiality, we cannot conclude that the District Court abused its discretion in denying the Duffys and Central Copters' motion to strike the juror for cause.

14

¶26 The Duffys and Central Copters also argue they were unfairly forced to use a peremptory challenge on prospective juror LeClair, the judge's stepdaughter, after the District Court prevented further inquiry into her potential bias by telling counsel to "move on" from that line of questioning. The Duffys and Central Copters cite to *Haynes v. County of Missoula*, for the proposition that "every litigant is entitled to a fair and impartial jury; that to secure this right, counsel for a litigant is entitled to question prospective jurors for the purpose of determining any bias or prejudice on their part." 163 Mont. 270, 287-88, 517 P.2d 370, 380 (1973) (holding that counsel may, in good faith, question prospective jurors on voir dire respecting their interest in, or immediate family members' connection with, liability insurance companies). They rely on the rule from *Reff-Conlin's Inc.* to argue that "when a district court erroneously denies a challenge for cause, [this Court] presume[s] that one party was prejudiced and is therefore entitled to a new trial." *Reff-Conlin's Inc.*, ¶ 28. As Thermal Design points out, the Duffys and Central Copters neither objected to the trial court's voir dire limitation nor challenged LeClair for cause; therefore, the automatic reversal rule and legal standard established in *Reff-Conlin's Inc.* does not apply and Appellants have waived any argument that the court inappropriately forced them to use a peremptory challenge. *See State v. Gunderson*, 2010 MT 166, ¶¶ 97-102, 357 Mont. 142, 237 P.3d 74. We agree.

¶27 Absent an abuse of discretion, "the trial judge has great latitude in controlling voir dire," and "[t]his Court will not presume prejudice" with respect to voir dire restrictions. *State v. LaMere*, 190 Mont. 332, 338-39, 621 P.2d 462, 465 (1980) (finding no reversible error in a judge's voir dire limitation after counsel objected to the limitation and abandoned

15

the line of questioning). Because this Court will not presume prejudice, "[i]f [prejudice] did exist, it is incumbent on [the party alleging prejudice] to bring the evidence of prejudice before us." *LaMere*, 190 Mont. at 338-39, 621 P.2d at 465 (citing *Kuchan v. Harvey*, 179 Mont. 7, 11, 585 P.2d 1298, 1301 (1978)). Notably, "[r]elation to the trial judge is not one of the grounds" for a challenge for cause under § 25-7-223, MCA; and "unless the juror falls within one of the [statutory] categories . . . [she] will not be removed for cause without a showing of partiality." *State v. Hendricks*, 171 Mont. 7, 11, 555 P.2d 743, 746 (1976) (citing *State v. Thompson*, 169 Mont. 158, 165, 545 P.2d 1070, 1073 (1976)).

¶28    It is clear from the record that Appellants' counsel did not object to the District Court's request to "move on" from questioning LeClair about her familial relationship with the judge. Appellants fail to present any argument beyond a mere assertion on appeal that they were somehow prejudiced by the claimed error. Instead, they assert that "the great impact on the jury of a judge's instruction to an attorney" excuses counsel's failure to object as any objection at that point in the trial would be perceived as "a personal affront to the judge and juror." "It is the duty of counsel to preserve the record for appellate review." *Searight v. Cimino*, 230 Mont. 96, 100, 748 P.2d 948, 950 (1988) (citing *Scofield v. Estate of Wood*, 211 Mont. 59, 63-64, 683 P.2d 1300, 1302 (1984)). Without an objection, or at least some evidence of partiality in the record, we conclude the District Court did not abuse its discretion by limiting voir dire regarding the trial judge's familial relationship with a prospective juror, and Appellants have waived any argument that the District Court unfairly forced them to use a peremptory challenge by not objecting below.

*2. Whether the District Court erred by ruling that Thermal Design's construction lien was valid against Central Copters, as the contracting party to a real estate improvement contract with TNT, and the Duffys, as landowners.*

¶29 The Duffys and Central Copters challenge the validity of Thermal Design's construction lien on several grounds. First, they contend the District Court erred by ruling that, as a matter of law, the contract between TNT and Central Copters to erect the hangar was a real estate improvement contract, arguing that because the lien was related to the insulation, the only relevant contract was the contract for the purchase of the insulation between TNT and Thermal Design. Next, they argue that because Thermal Design contracted with Johns Manville to manufacture, or "fabricate," the insulation materials, they cannot claim a construction lien under § 71-3-524, MCA. Finally, they assert that there was insufficient evidence to establish agency between TNT and either Central Copters or the Duffys for the insulation purchase.

¶30 Under Montana law, a "real estate improvement contract" is defined as "an agreement to perform services, including labor, or to furnish materials for the purpose of producing a change in the physical condition of the real estate," and includes "construction or installation on, above, or below the surface of land." Section 71-3-522(6)(a)(ii), MCA. "A person who furnishes services or materials pursuant to a real estate improvement contract may claim a construction lien . . . to secure the payment of the person's contract price." Section 71-3-523, MCA. The "contract price" is "the amount agreed upon by the contracting parties for performing services and furnishing materials covered by the contract." Section 71-3-522(3)(a), MCA.

17

¶31 Montana law limits the applicability of construction liens for materials in § 71-3-524, MCA, which provides, in pertinent part:

> (1) A lien for furnishing materials only arises if:
> (a) (i) the materials are supplied with the intent that they be used in the course of construction of or incorporated into the improvement in connection with which the lien arises; and
> (ii) the intent described in subsection (1)(a)(i) may be shown by a contract of sale, by a delivery order, by delivery to the site by the lien claimant or at the lien claimant's direction, or by other evidence; and
> (b) the materials are:
> (i) incorporated in the improvement or consumed as normal wastage in construction operations; [or]
> (ii) specifically fabricated for incorporation into the improvement and not readily resalable in the ordinary course of the fabricator's business, even though the materials are not actually incorporated into the improvement.

¶32 When a construction lien is applicable, "[i]f [an] improvement is made to leased premises, the lien attaches to the improvement and to the leasehold term." Section 71-3-525(3), MCA. However, if an improvement is made to leased premises, the lien "does not attach to the lessor's interest unless the lessor contracted for or agreed to the improvement before it was begun." Section 71-3-525(3), MCA.

¶33 Montana law does not require a contract between the owner of the property and the material supplier for a construction lien to attach when a property owner either expressly or impliedly consents in advance to an improvement to his real estate or subsequently ratifies the purchase of materials or work that has been done. *Morin Lumber Co. v. Person*, 110 Mont. 114, 117, 99 P.2d 206, 207 (1940).

> [T]o be entitled to a lien, a claimant must connect himself with the owner in some way, directly or indirectly, by some link of a contractual nature; as in all cases, the owner must have contracted with some one [sic] for the improvement of the property or at least must have authorized, requested, knowingly permitted or consented to such improvement.

18

*Morin Lumber Co.*, 110 Mont. at 117, 99 P.2d at 207. "The rationale behind this rule is that by virtue of the contract between the contractor and the owner, there is an implied agency between the two, giving the contractor the authority to contract with materialmen for the purchase of necessary materials." *Glacier State Elec. Supply Co. v. Hoyt*, 152 Mont. 415, 419, 451 P.2d 90, 91-92 (1969).

¶34 There is no dispute that Central Copters had an agreement with TNT to construct the pre-engineered steel building on the real property it leased from the Duffys. This agreement meets the definition of a real estate improvement contract in § 71-3-522(6)(a)(ii), MCA—it is "an agreement to perform services . . . for the purpose of producing a change in the physical condition of the real estate." Independent from the scope of that agreement, the District Court did not err when it found that, as a matter of law, this agreement was a qualifying real estate improvement contract under the statute. The District Court did not err by holding that TNT purchased the insulation from Thermal Design pursuant to TNT's contract with Central Copters. The record reflects that TNT engaged Thermal Design to furnish a Simple Saver System specific to Central Copters' building, which was shipped in three parts directly to Central Copters without immediate objection by Mark or anyone at Central Copters.

¶35 On appeal, the Duffys and Central Copters take issue with the District Court's Special Verdict Form because it inserted "Thermal Design" in place of "fabricator" in the following question: "Was the Simple Saver System readily resaleable in the ordinary course of *Thermal Design's* business?" (Emphasis added.) They argue that Johns

19

Manville, not Thermal Design, was indisputably the "fabricator" of the insulation under § 71-3-524(1)(b)(ii), MCA. This argument fails for two reasons.

¶36 First, the Duffys and Central Copters point to no authority that mandates every component of a system or structure provided to a general contractor be fabricated directly by the party furnishing the materials, and § 71-3-524(1)(b)(ii), MCA, plainly does not require this. If that were so, a company supplying materials containing components procured from multiple vendors could never file a construction lien for an unpaid contract for those materials. Thermal Design presented ample testimony about its proprietary Simple Saver System, which requires that each insulation kit is designed, developed, and fashioned—in other words, fabricated—by Thermal Design for use solely by Thermal Design's clients. While some components of that kit, like the insulation itself, may have been fabricated and shipped independently, the jury's findings in a case like this need not be limited to each individual piece of a proprietary system. There is substantial evidence in the record that Thermal Design satisfies the requirements of a "fabricator" under § 71-3-524(1)(b)(ii), MCA. Thus, when viewed in the light most favorable to Thermal Design, the jury's finding that the Simple Saver System insulation kit, as a whole, was not readily resaleable in the ordinary course of either Thermal Design *or* Johns Manville's business is not "inherently impossible to believe." *Wise*, 284 Mont. at 339, 943 P.2d at 1312. Second, as Thermal Design points out, the Duffys and Central Copters failed to object to the Special Verdict Form on these grounds at trial. "The failure to object to a verdict form and/or jury instructions at trial results in a waiver of the right to challenge

20

them on appeal." *Turk v. Turk*, 2008 MT 45, ¶ 16, 341 Mont. 386, 177 P.3d 1013. The Duffys and Central Copters have waived this issue on appeal.

¶37 Because there was no evidence that would justify submitting the issue to the jury, *Johnson*, ¶ 18, the District Court did not err by holding that, as a matter of law, the Simple Saver System insulation kit was purchased pursuant to Central Copters' real estate improvement contract with TNT.

¶38 The Duffys and Central Copters next argue that the jury had insufficient evidence of agency between TNT and either Central Copters or the Duffys for the purchase of the insulation.[2] Thermal Design points to testimony and Mark's August 15, 2014 e-mail to Steve, inquiring as to whether TNT had "ordered the insulation for the building from the source you have," noting that August 15, 2014, is "well before TNT began erecting" the building. Alternatively, Thermal Design asserts that, looking beyond the fact that the Duffys cannot plausibly argue that Mark did not consent to the improvement before it began, Mark subsequently adopted the purchase when he failed to initially reject the three Simple Saver System shipments but instead sought help from Thermal Design to find another installer and offered to pay Thermal Design for the insulation directly.

---

[2] The Duffys and Central Copters also argue that the District Court improperly allowed verbal testimony regarding the agency relationship because, under the Uniform Commercial Code's statute of frauds, § 30-2-201(1), MCA, the contract for the Simple Saver System had to be in writing, the authority to enter the contract likewise had to be in writing under § 28-10-203, MCA. This argument is unavailing, as "[t]he rationale behind [Montana's construction lien scheme] is that by virtue of the contract between the contractor and the owner, there is an implied agency between the two, giving the contractor the authority to contract with materialmen for the purchase of necessary materials." *Glacier State Elec. Supply*, 152 Mont. at 419, 451 P.2d at 91-92. If the contractor's authorization to purchase materials was required to be in writing, the agency would be express and an implied agency would be unnecessary.

21

¶39 Substantial evidence supports the jury's agency finding. Steve testified that he, Travis, and Mark had a meeting "focused on" the Simple Saver System, and that he later provided Mark with a brochure containing information on the Simple Saver System as well as photographs from the internet showing the insulation kit fully installed. Travis largely corroborated Steve's testimony about that first meeting, indicating his impression was that "Mark was liking the Simple Saver System and wanted more information on it." Mark disputed that he was focused only on the Simple Saver System, stated that he had "never heard of Thermal Design," and denied having received Thermal Design's brochure; however, Mark also testified that he had come to an agreement with TNT that TNT would be procuring the building's insulation on his behalf "[a]t some point." In response to questioning about TNT's authority to order insulation, Mark testified: "They were just supposed to do it, and that's why I sent the one email with all the bullet points on it to try to get them off -- my experience with Thorsons is, 'Come on. Let's go. Move. Move.'"

¶40 While Mark offered a competing narrative to the jury, the Duffys and Central Copters have failed to establish that the jury's verdict is "inherently impossible to believe," *Wise*, 284 Mont. at 339, 943 P.2d at 1312, and we will not "second-guess or seek to replace the jury" by making our own determination about the credibility of witnesses and the persuasiveness of the evidence on appeal, *Stubblefield*, ¶¶ 19, 21.

¶41 The District Court correctly held that Thermal Design's construction lien attached to Central Copters' building because it was an improvement to a leased premises. The District Court also correctly held that Thermal Design's construction lien attached to the

22

Duffys' property, the lessor's interest, because the Duffys, as lessors, agreed to the improvement before it began.[3]

3. *Whether the District Court erred by allowing TNT Building Systems to make a crossclaim against Central Copters that was not included in the pretrial order.*

¶42 Central Copters seeks reversal of the $23,753.88 judgment in favor of TNT, arguing that the District Court allowed TNT to assert a last-minute crossclaim for unpaid labor costs against them. While Central Copters acknowledges that TNT asserted the claim in their answer brief that was attached to their motion to set aside the clerk's entry of default, it maintains that the claim was undeniably not included in the final pretrial order, which supersedes the pleadings. TNT did not respond to this issue on appeal.

¶43 It is well established that the final "pretrial order supersedes the pleadings, states the issues to be tried, and controls the subsequent course of the action" unless modified by a subsequent order. *Masters Grp. Int'l, Inc. v. Comerica Bank*, 2021 MT 161, ¶ 56, 404 Mont. 434, 491 P.3d 675 (citing *Ganoung v. Stiles*, 2017 MT 176, ¶ 28, 388 Mont. 152, 398 P.3d 282); *Weimar v. Lyons*, 2007 MT 182, ¶ 20, 338 Mont. 242, 164 P.3d 922. While the Montana Rules of Civil Procedure provide that the pretrial order is to control the subsequent course of action, they further allow for modification at trial, and it is within the trial court's discretion to allow amendment of the pleadings during trial if the objecting party fails to show that an amendment would result in prejudice. *Keaster v. Bozik*, 191 Mont. 293, 297-98, 623 P.2d 1376, 1379 (1981) (quoting M. R. Civ. P. 15(b)).

---

[3] Because we conclude that the jury was correct to find the Duffys agreed to the improvement before it began, we need not address Thermal Design's contention that Mark adopted the purchase by inaction after it was delivered.

¶44   We have reviewed the final pretrial order.  The Duffys and Central Copters are correct that TNT's crossclaim was "neither embraced within the language nor otherwise implicit in the pretrial order," *Ganoung*, ¶ 28, and therefore is unpreserved.  However, as the District Court reasoned during trial, counsel for the Duffys and Central Copters "filed multiple documents regarding that claim, so there's no surprise or prejudice related to [the claim]."  All parties were well aware that TNT was seeking damages for its unpaid invoice, which included labor and the Simple Saver System.  The District Court did not abuse its discretion by amending the pleadings to include TNT's crossclaim during trial because Central Copters failed to show that the amendment prejudiced them in any way.

**CONCLUSION**

¶45   The District Court did not abuse its discretion during voir dire by denying Appellants' challenge for cause or by limiting questions regarding the trial judge's familial relationship with a prospective juror.  Appellants waived any argument that the District Court unfairly forced them to use a peremptory challenge on prospective juror LeClaire by neither objecting to the District Court's voir dire limitation nor challenging LeClair for cause.  The District Court did not err by holding that, as a matter of law, the Simple Saver System insulation kit was purchased pursuant to Central Copters' real estate improvement contract with TNT.  The evidence was sufficient for the jury to conclude that Thermal Design's construction lien attached to both Central Copters' building and the Duffys' real property because the Duffys, as lessors, agreed to the improvement before it began.  Finally, the District Court did not abuse its discretion by allowing TNT to pursue its

24

crossclaim because Central Copters has failed to establish that this resulted in prejudice.

We affirm.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE